THE PEOPLE on the relation of JABEZ BENTLEY vs. SAMUEL HANNA.

A writ of *habeas corpus ad subjiciendum* was allowed by Mr. Justice Harris, directed to the Defendant, commanding him to bring the relator before the said justice, to inquire into the cause of his detention. In return to the writ, the Defendant claimed the right to the services and custody of the relator, by virtue of indentures of apprenticeship, executed by the superintendents of the poor of the county of Columbia, September 5, 1838, whereby, after reciting that the relator, a male child, aged 10 years, *had been sent to the county poor-house,* from the town of Kinderhook; he was bound to the defendant, "*to serve as an apprentice to the employment of manufacturing, until the said apprentice shall be 21 years of age.*"

*Daniel Reynolds* was examined as a witness in behalf of the Defendant, and testified that at the date of the indentures, he was an overseer of the poor for the town of Kinderhook; that shortly before that time the mother of the relator had applied to him to have the relator bound as an apprentice to the Defendant, stating that her husband had deserted her; that she could not support the boy, and the Defendant was willing to take him; that he told her he had never done such a thing, but that he was going to the county house soon, and would take the boy along, if she desired it, and have the superintendents bind him; that he accordingly, at the mother's request, took the relator to the county superintendents, who executed the indentures. Upon cross-examination, the witness stated that no application was ever made to him by the mother of the boy for relief.

It was insisted on the part of the Defendant, that there being no proof before the justice who allowed the writ, that there was no officer in the county of Columbia authorised to grant the writ, or that such officer was absent, or had refused to grant the writ, or was incapable of acting, as required by the provisions of the 24th section of the statute, relating to the habeas corpus, the application ought to have been denied; and the writ having been allowed without such proof, the proceedings should be dismissed for want of jurisdiction.

G. W. PECKHAM and C. P. SCHERMERHORN, *for Relator.*
M. T. REYNOLDS and A. VANDERPOEL, *for Defendant.*

HARRIS, Justice.—It has recently been held by Mr. Justice Willard, upon an application to him at his office in Saratoga Springs, in the case of Woodruff ads. The People, for the allowance of a writ of habeas corpus to bring up a prisoner confined in the jail of Washington county, that a county judge of the degree of counsellor, is authorised to perform the duties of a justice of the supreme court at chambers. In this decision I entirely concur. And it having been conceded, upon the hearing of this case, that there is in the county of Columbia a county judge of the degree of counsellor, the application for this writ ought to have been denied, if the provisions of the 24th section of the act in relation to writs of habeas corpus, (2 R. S., 564,) are applicable to such a case.

The statute as it existed prior to the revision of 1830, made it the duty of the chancellor, and every judge of the supreme court, to whom proper application was made, to allow the writ. But it is contended that the section of the Revised Statutes, already referred to, restricts the jurisdiction of the chancellor and justices of the supreme court, as well as other officers authorised to perform the duties of a justice of the supreme

court at chambers, to cases arising in the county where such officer resides. By the 23d section, it is provided that the application may be made to the supreme court during its sitting, or to the chancellor, or to any of the justices of the supreme court, *or any officer who may be authorised to perform the duties of a justice of the supreme court at chambers, being or residing within the county where the prisoner is detained,* or if there be no *such officer* within such county, or if he be absent, or for any cause be incapable of acting, or have refused to grant such writ, then to some such officer having such authority residing in any adjoining county.

The limitation in the last clause of this section was a new provision introduced by the revisers into the habeas corpus act; and the 24th section was also added, for the purpose of carrying out this new provision. There does not seem to have been any intention on the part of the revisers, or the legislature that enacted the Revised Statutes, to limit the power of ·the chancellor or judges of the supreme court, as it had previously existed. The limitation contained in the words "*being or residing within the county where the prisoner is detained,*" seems to have been intended to apply to the last preceding class of officers "authorized to perform the duties of a justice of the supreme court," leaving to the chancellor and justices of the supreme court the same unrestricted jurisdiction in such cases as they had possessed under the previously existing statutes.

This construction of the statute in question is sustained by what is understood to have been the uniform practice of the chancellor and justices of the supreme court since it was enacted. In the case before Justice Willard already referred to, that justice allowed the writ returnable before the county judge of Washington, when, if the construction of the statute contended for by the Defendant is to prevail, he should have dismissed the application, on the ground that there was an officer "residing within the county where the prisoner was detained," who had jurisdiction of the case. It is manifest that the proof required by the 24th section of the act, could not have been produced before the justice to give him jurisdiction. He must have acted upon the assumption that a justice of the supreme court has power to allow a writ of habeas corpus, in whatever part of the state the prisoner may be detained.

In the case of The People on the relation of Barry vs. Mercein, the chancellor, at Saratoga Springs, allowed a writ of habeas corpus to bring up the child of the relator from the city of New York. In that case the chancellor says, (8 Paige, 55,) "It is not material to inquire whether the chancellor, in allowing the writ of habeas corpus, acts as a mere commis-

sioner under the statute, or as a court proceeding by virtue of an inherent power derived from the common law, but regulated in the exercise of that power, by the special provisions of the Revised Statutes on the subject."

At the time the chancellor allowed the writ in that case, there were officers residing in the city of New York authorised to perform the duties of a justice of the supreme court at chambers, and if the limitation contained in the act referred to is applicable to the chancellor and justices of the supreme court, as well as officers authorised to perform the duties of a justice of the supreme court at chambers, then the chancellor had no authority to allow the writ, unless by virtue of the "inherent power of the court of chancery derived from the common law," to which the chancellor refers.    If therefore the construction for which the Defendant contends, had been regarded by the chancellor as the true meaning of the act in question, *it would have been material* for him to inquire whether he acted as a mere commissioner under the statute, or in the exercise of the inherent power of the court of chancery, for unless such inherent power could be shown to exist, the chancellor would have had no jurisdiction in the case.

These views seem to be further sustained by the provisions of the 1st section of chapter 240 of the Session Laws of 1837, authorising the chancellor and any justice of the supreme court, to whom application for a writ of habeas corpus shall be made, in his discretion, to make such writ returnable "*before some other officer authorised to issue such writ in the county where the prisoner may be confined.*"    For it is manifest that if the chancellor or any justice of the supreme court is bound by section 24 of the habeas corpus act, to deny the application when the proof required by that section is not produced, the provision of the act of 1837 referred to, would be entirely nugatory.

Having come to the conclusion that a justice of the supreme court has power, under the provisions of the statute, to allow this writ, notwithstanding there may be an officer in the county where the relator is alleged to be restrained of his liberty, authorised to exercise the same power, I have not thought it necessary to inquire whether an "inherent power" to allow the writ existed in the court of chancery; or, if it did, whether under the provisions of the new constitution and the judiciary act, such power may be exercised by a justice of the supreme court at chambers. In the case of the People vs. Mercein, already referred to, the chancellor says: "Were it necessary, I think there would be no difficulty in shewing that the power of the chancellor to issue a habeas corpus, is not derived from the statute, but is also an inherent power in the court, derived from

the common law." I may add, that were it necessary, I think there would be no difficulty in showing that whatever inherent power existed in the court of chancery under the late constitution, may under the present constitution and laws be exercised by a justice of the supreme court at chambers.

With this view of the case, it becomes necessary to examine the grounds upon which the Defendant claims the services of the relator, and of course the validity of the indentures of apprenticeship, upon which he relies to sustain that claim.

It is provided by law, that infants, if males, under the age of twenty-one years, and if females, under the age of eighteen years, may be bound by indenture, *of their own free will,* and *by their own act, with the consent* of their father, or mother, or guardian, or testamentary executors, or where there is no such parent or guardian, then with the consent of the overseers of the poor, or two justices of the peace, or any county judge. In all such cases the infant can only be bound by himself becoming a party to the deed. The father himself has no authority under the statute, nor even at common law, to bind his infant son an apprentice, *without the free will and act of the child.* To this general rule there is one exception, and but one. It is provided by statute, (2 R. S., 155, § 5,) that "the county superintendents of the poor, in the several counties, may *bind out* any child under the ages above specified, *who shall be sent to any county poor house,* or who is, or shall become chargeable, or whose parent or parents are or shall become chargeable, to such county, to be clerks, apprentices, or servants," &c., which binding shall be as effectual as if such child had bound himself with the consent of the father.

It is under the exercise of this extraordinary power by the county superintendents of the poor for the county of Columbia, that the defendant claims the right to the custody and services of the relator. The first and most important question which arises is, whether the superintendents of the poor ever acquired such jurisdiction over the person of the relator, as authorised them to exercise this extraordinary power. The statute under which they assume to act, being in restraint of the rights of personal liberty, is to be strictly construed. Nothing is to be taken by implication. It is not pretended that at the time the indentures were executed, the relator, or his mother, had become chargeable to the county, but it is insisted that the relator *"had been sent to the county poor house."* Before the superintendents acquired the right to dispose of the liberty of a child during his minority, under this clause of the statute,

something more is necessary than that a child be "*sent to the county poor house*" to visit a friend, or even to be "*bound out.*" The term, "sent to the county poor house," has reference to the object for which such poor house was erected, and a person can only be said to have been sent there, within the meaning of the statute, when he is sent according to law, and for the purposes contemplated by the law.

By the 39th section of the statute relating to the relief and support of indigent poor, (1 R. S., 624,) it is provided that "when any person shall apply for relief to any overseer of the poor in any county where a poor house is established, such overseer shall inquire into the state and circumstances of the applicant. If it shall appear that the applicant is in such indigent circumstances as to require *permanent relief and support*, the overseers shall by a written order cause the poor person to be removed to the county poor house, to be relieved and provided for, as the necessities of such applicant shall require." It can scarcely be necessary to do more than refer to this statute, to show that the relator was never sent to the county poor house, in the sense in which that expression is used in the statute referred to. Did he, or his mother for him, ever apply to the overseer of the poor for relief? Did the overseer of the poor, upon inquiry into the state and circumstances of the relator, ever adjudge that he was in such indigent circumstances as to require *permanent relief and support?* Did the overseer of the poor, ever by his written, or any other order, or in any other manner, cause the relator to be removed to the county poor house, *to be relieved* and provided for, as his necessities might require? And yet all this must have been done before the relator can be said to have been sent to the county poor house, so as to authorise the superintendent to "*bind him out.*" So far from this being the case, it is not pretended that any application for relief was ever made to the overseer of the poor, or that any examination into the state and circumstances of the relator was ever made by him, or that he ever caused the relator to be removed to the county poor house to be provided for, and relieved as his necessities might require. Nothing was done to clothe the superintendents with the extraordinary power which they assumed to exercise, except that the overseer of the poor, at the instance of the mother, took the child to the superintendents, and requested them to bind him to the Defendant. The statute which confers this power, cannot so easily be satisfied, and I must therefore hold that the indentures set forth in the Defendant's return to the writ, in this case are void, for want of authority in the county superintendents to execute them.

Various objections were made by the counsel for the relator to the form of the indentures. It is provided by law that "no indenture or contract for the service of any apprentice, shall be valid as against the person whose services may be claimed, unless made in the manner prescribed by law." I am inclined to think the indentures fatally defective in this respect, but the conclusion at which I have arrived, renders it unnecessary that I should decide these questions. An order must be made for the discharge of the relator.