## SUPREME COURT.

### THE PEOPLE *ex rel.* CHARLES TRAINER, appellants, agt. ROSE COOPER, respondent.

The Supreme Court have the power of awarding a writ of *Habeas Corpus* at a special term. (*As was formerly held under the old system, see ex parte Beatly,* 12 *Wend.* 229.) And also at *Chambers.* This power is given by the common law, independent of the statute.

A justice of this court can, at Chambers, award a writ of *Habeas Corpus* that shall run into *any part of the State.* The justices have the same unrestricted jurisdiction as they possessed under the previously existing statutes. (*See People agt. Hanna,* 3 *How. Pr. R.* 39.)

It *seems,* that a Justice of the *Superior* Court in the city of New York is not clothed with the general equity powers, necessary to make a final disposition of the care and custody of children, brought before him on *Habeas Corpus.* And where such a case may have been brought before that court or a justice thereof, and preliminarily passed upon, such adjudication can be no bar to final action by the Supreme Court, a competent tribunal, in settling the questions in controversy.

A statute of Alabama forbidding slaves to marry, does not render the marriage of a slave void; where it is solemnized by words *de presenti* (by a minister,) and is followed by cohabitation of the parties. It is good as a marriage at common law.

The *father,* (whether black or white) is by law entitled, over all others, to the custody, care, and control of his child of tender years. If the child is *illegitimate* of the father, he is still entitled to its custody over every other person except the mother

The *detention* of a child of tender years amounts to *legal restraint,* where the individual having it in custody, without the exercise of force or coercion, interferes by influence over the affections of the child, or studiously guards and keeps it beyond the reach of the father, or endeavors to maintain a determination in the child not to go to its father, and to repel all attempts on his part to obtain possession of the child against her will.

Where a child nine years of age, held under improper restraint, from the custody and possession of the father, on proceedings by *Habeas Corpus, held,* that it was the duty of the Court, not only to remove the restraint, but to render a judgment which should dispose of the custody of the child and conclude the controversy.

It *seems* that in cases of *adults* held under improper restraint, it is proper for the Court merely to remove the restraint. As they are supposed to have wisdom and discretion sufficient to take care and choose for themselves.

*Brooklyn Special Term, May,* 1853.

E. D. CULVER, *for Relator.*

JAS. T. BRADY, *for Respondent.*

BARCULO, Justice.—The case comes before the court on the return of the respondent to a writ of *Habeas Corpus,* sued out by the relator to obtain the custody of his infant child. Upon its merits, when divested of those extraneous circumstances which have given an unnatural interest and notoriety to the matter, it is very plain and simple. But several nice and highly important legal questions have been presented and argued by the learned counsel, which it will be proper first to consider.

I. It is contended by the counsel for the respondent that the power of awarding a writ of *Habeas Corpus* by this court, can be exercised only at a *general* term. Reliance is had upon the statute which requires the application to be made, "1st. To the Supreme Court, during its sitting; or 2d. During any term or vacation of the Supreme Court, to the Chancellor or any one of the justices of the Supreme Court, or any officer who may be authorized to perform the duties of a justice of the Supreme Court, at Chambers, being or residing within the county where the prisoner is detained." This precise question came before the court under our former system, when special terms were held for the transaction of certain non-enumerated business; and Chief Justice SAVAGE expressly decided that the writ could be issued by the court at special term. *Ex parte Beatley,* (12 *Wen.* 229.) It is hardly necessary to add, that under our present system, much greater powers are given to the special terms; for we possess not only the general powers of the old Supreme Court, but also the entire powers of the former Court of Chancery, either of which courts had, without the aid of any statute, at the common law, jurisdiction over *Habeas Corpus.*

II. Again it is insisted that a single justice, sitting in Kings county, has no authority to send the writ into the city of New York. This argument is based upon the supposition, that the writ was issued by the justice, and not by the court, which is

unfounded in fact. But if the fact were as supposed, the argu-
ment would nevertheless be fallacious. For a justice of this
court can, at Chambers, award a writ of *Habeas Corpus* that shall
run into any part of the State. This point was before Justice
HARRIS, in The People agt. Samuel Hanna, (3 *How. Pr. Rep.*
39.) He there held that the limitation contained in the words
"*being* or *residing within the county*," in the statute above
cited, which is relied on by the counsel, applied to the last
preceding class of officers, "authorized to perform the duties
of a justice of the Supreme Court;" leaving to the justices of
the Supreme Court the same unrestricted jurisdiction as they
possessed under the previously existing statutes. In that case
a writ was allowed by Judge HARRIS, sitting in Albany, to
bring up a person detained in Columbia county. So also in
The People agt. Woodruff, (3 *How. Pr. Rep.* 32,) Justice
WILLARD allowed a writ at his Chambers at Saratoga Springs,
returnable before the county judge of Washington, to bring up
a prisoner in the latter county. So in the familiar case of The
People agt. Mercein, (8 *Paige*, 55,) the Chancellor sitting at
Saratoga Springs, brought before him a child from the city
of New York. It may be added that these decisions are in
entire conformity to the general practice of the Judges of this
court.

III. It is contended that the matter is *res adjudicata*—the
same question having recently been heard before Judge DUER,
of the Superior Court, city of New York. Two answers may
be given to this proposition. *First.* The case does not stand
upon the same state of facts; for the relator has given evidence
of restraint having been exercised since the former proceeding.
*Secondly.* That learned and accomplished judge doubted his
authority to make an order disposing of the custody of the child.
That doubt probably controlled his decision, and may have
been well founded as applied to the judge of a court of limited
jurisdiction, and clothed with no general equity powers. Upon
this point I quote from the opinion of Judge DUER the follow-
ing: "I entirely concur with the learned counsel for the
respondent, that I am not sitting here as a judge in equity

clothed with those large discretionary powers in relation to the disposition and custody of infants, which the Lord Chancellor in England, as the representative of the Sovereign, is competent, and has long since been accustomed to exercise. Powers just as extensive, I doubt not, were vested in our late Court of Chancery, and if so, by force of the new constitution, have been transferred to, and are now vested in the Supreme Court of the State. But they do not belong to me either as a Supreme Court commissioner, or as a judge of the Superior Court. I cannot, therefore, exercise the discretion which they confer, even could I be justified in acting at the same time, and in the same proceeding, in a double capacity. The Supreme Court, as succeeding to the entire jurisdiction of the Chancellor, is the general guardian of infants, and as such has an exclusive right to determine all questions in relation to their disposition and custody, except where those questions properly arise in an action between husband and wife, for an absolute or limited divorce."

It will thus be seen that the learned judge concedes to this court the powers which he did not deem himself to possess, and which are now invoked and necessary to afford the relief prayed for. The argument of *res adjudicata*, therefore falls to the ground. For it would be idle to talk of a previous adjudication being a bar, when the former tribunal had no right to adjudicate the point in controversy. It will also be seen that we in no manner conflict with the decision of Judge DUER. This court, being clothed with full legal and equitable powers, entertains no doubt of its authority to make a final disposition of this matter.

IV. We will now proceed to examine the case upon its merits. Charles Trainer, the relator, claims that Jane Trainer, an infant, nine years of age, is his legitimate child; and that the respondent, without authority, detains her at a house of ill fame, No. 101 Mercer street, in the city of New York. The respondent admits that the relator is the father of Jane, but denies that he was lawfully married to her mother, the latter being a slave; and denies that the child is under any restraint;

and avers that she *voluntarily* remains with the respondent. These are the substantial facts upon which the decision depends; although numerous irrelevant matters have been brought into the case, and quite an unnecessary amount of ill-feeling excited and displayed. These matters relate to the fact, that Jane was born a slave belonging to the respondent—that she was made free by respondent moving into the State of Ohio before she came to New York, and that the relator is, and always has been, a free black man.

It is hardly necessary to remind the parties and their counsel, that, upon a question of this kind, the law, in this State, recognizes no distinction of color or race; and that all fathers, whatever may be their standing in society, have precisely the same legal authority and control over their children. The relator stands before the court, simply as a man, prosecuting his paternal rights; while the respondent appears as a woman having no claim upon the child by argument or consanguinity, but only through the affections. It is wholly unnecessary therefore to enquire into the complexion of the one, or the reputation of the other. If she were the most exalted lady in the land, and he, the most humble of its inhabitants, their rights, in the eye of the law, and their consideration in the view of this court, would be the same.

In regard to the legitimacy of the child, I have been somewhat embarrassed, because there is no direct evidence of the fact except the testimony of the relator himself. For although such testimony has been usually admitted, I am not quite sure that it stands upon any solid foundation. In the view, however, which I take of the case, the legitimacy of the child is not a fact of vital importance.

The relator swears that he was married in Mobile, by a black Methodist preacher, his wife being a slave, and both members of that denomination. Upon this it is claimed by respondent's counsel, that the marriage is void, by reason of a statute of the State of Alabama, forbidding slaves to marry. Whether it be true, as the argument tends to show, that all the slaves in that State are illegitimate, it is not necessary more particularly to

The People *ex rel.* Trainer, agt. Cooper.

enquire.   It is sufficient for us that the marriage being by words *de presenti*, and followed by cohabitation, is good, as a marriage at common law.

Assuming, then, that the child is legitimate, how stands the question between the father and the respondent, as to its custody?   To this question but one answer can be given.   That the father has a title superior to any stranger, is not less the doctrine of the authorities, than it is a principle of human nature.   The father's rights are paramount even to the mother's, until he forfeits his claim by misconduct or ill-usage.   *People ex rel Nickerson*, (19 *Wen.* 16.)   He is bound to support and maintain it.   He is therefore, " the natural guardian and entitled to its custody, care and education."   He has the natural right to bring it up in his own faith, and give it such instructions and discipline as he may deem best for its present and future welfare.   In the language of Judge BRONSON, in Mercien agt. the People, (25 *Wen.* 72,) " the law regards him as the head of the family ; obliges him to provide for its wants ; and commits the children to his charge, in preference to the claims of the mother or any other person."

Even if we lay aside the relator's testimony, and adopt as true the statement in the return, that Jane is his illegitimate child ; still his claim would be superior to that of the respondent, or any other stranger, although inferior to that of the mother.   (1 *Clarke Ch. Rep.*)

In every aspect, therefore, in which this case can be viewed, we are compelled to admit that the father's right to the possession of the child, is superior to that of the respondent.   And I may be pardoned for saying, that if he moved in the higher walks of life—if he were a white man of standing and influence in the community, the truth of this proposition would be *universally* acknowledged ; and any tribunal that, having authority, should hesitate to afford him relief, would subject itself to just reproach.   The public voice, as well as common sense, would declare, that if our courts permit children of such an age to leave their parents and take up their abode as they please, a most valuable social relation would be subverted, and the

foundations of domestic peace and enjoyment broken up and destroyed.

V. Again it is insisted, that there is no restraint, because the child remains with the respondent of her own free will. This brings up the important enquiry what is legal restraint, as applied to an infant of this tender age ? The position of the counsel would undoubtedly hold true of an adult, who, when delivered from the detention, becomes his own master, and is presumed to know where to go, and how to take care of himself; but it is by no means true of a young, ignorant child. In such cases there may be legal restraint, without the exercise of any force or coercion. It is enough that the accused interferes to prevent the father from forcibly taking possession of the child. The person having the custody of such an infant, without any claim of right, is bound to deliver it over into the hands of the father, whenever he presents himself to receive it; and is not permitted to retain possession of it, under the pretence, however true it may be, that the child desires to remain. Thus, if a child go to a neighbor's house and conclude to abide there; when the father demands it of that neighbor, it is not sufficient for the latter to say to him, "you may come in and persuade it to go home, and if you succeed in gaining its consent you may take it, but you shall not *compel* it to go." He is bound to permit the father to exercise his parental authority of coercion; and if he prevents that, he is guilty of restraint, within the fair meaning of the term. Any other rule would work monstrous evils. Hundreds of children could be taken from their parents by the childish affection which they bear towards their nurses. In Mercein agt. the People, (25 *Wen.* 80,) BRONSON, Justice, observes: " The question here is not whether the child is actually suffering under duress of imprisonment; but whether there is that kind of restraint which defeats the rights of the father. The respondent, having the child under his roof, positively forbids the father to enter the house, except upon terms which a proper self-respect made inadmissible; but, if he could submit to the terms, he only had a license to enter the house—' to see Mary,'—not for the purpose of

The People *ex rel.* Trainer, agt. Cooper.

taking her under his care and protection. It is impossible to deny that this is such a restraint as defeats the right of the father, and lays the proper foundation for asking redress by *habeas corpus.*"

In the case before us, it is clear, that the child is studiously guarded and kept beyond the reach of the father. The most that is pretended is, in the language of the return, that " she has enjoyed and so far as the respondent is concerned, shall enjoy, entire and undisturbed liberty to go where she pleases." In other words, and this fact is sustained by the proof, she is prepared and resolved, knowing the child's partiality for herself, to maintain Jane in her determination not to go to her father, and to repel all attempts on his part to obtain possession of the child against her will. We have no hesitation in determining that the conduct of the respondent amounts in law to *restraint.*

VI. Having arrived at the conclusion that the relator is legally entitled to the care and custody of his daughter, and that she is held under improper restraint by the respondent, the only remaining inquiry is, as to the remedy.

The former demands a delivery; while the latter insists that the powers of the court are exhausted, when we shall have removed the restraint and set the child free. The one claims that some results should follow the decision, the other proposes to return in *statu quo ante bellum.*

It has already been substantially admitted that, in regard to adults delivered by the statute writ, the proposition of the respondent's counsel is tenable; and that it was properly so held by Judge Duer, sitting as a commissioner under the statute, is not controverted. But that it is correct as applied to a case in this court, of ample jurisdiction independent of the habeas corpus act, is most confidently denied.

We are aware that some of the cases speak of children exercising their own choice and discretion. This may be well enough, when we are assured that they possess what may fairly be called discretion. Whether this can even be predicated of children under fourteen years of age, in whom the law, in

numerous respects, declares there is *no discretion*, we need not now determine. It is sufficient for us that this child does not manifest that degree of judgment, which, in the opinion of this court, would qualify her to select her own domicil and guardian. That she is old enough to feel a preference, and that such feeling is towards the respondent, is quite apparent. But that such preference is wise and discreet cannot be admitted. Indeed it can hardly be contended that a house of ill-fame is a proper place, or one of its inmates a suitable person for the education of any child. But independent of this overwhelming proof of actual indiscretion, we cannot sanction nor give countenance to the doctrine, that such children are to control their own movements and select their own places of residence. It has no foundation in reason or justice, and is plainly opposed to the laws of the land, as well as the law of God.

The court must therefore go further than merely remove the restraint, by rendering a judgment which shall dispose of the custody of the child and conclude this controversy. It would be an idle ceremony for the court to try a cause without making a decision by which the fruits of the litigation could be reaped. We have a multitude of precedents for our guidance in this particular. In the matter of Dowles, (8 *John. Rep.* 328,) the Supreme Court " ordered the boys to be delivered to their master, and directed an officer to attend and protect them in their return." In The People agt. Mercein, (3 *Hill*, 399,) Chief Justice NELSON concludes his opinion in these words: " an order must therefore be entered that the child be delivered to the relator." That was a case where, after two or three years of litigation, the court ordered the child to be taken from its mother and grandfather and given to the husband and father, although the child was under five years of age. And in a former stage of that case, (25 *Wen.* 97,) the chancellor, in commenting on the powers of the Supreme Court to award the custody of the child, on reversing the proceedings of Judge INGLIS, declared, " that if he was wrong, the Supreme Court should not only have reversed his decison, but should also have proceeded to make a final disposition of the custody of the

child." And in The People *ex rel* Nickerson, (19 *Wen.* 16,) an order was made that "the child be delivered to the father, and that the care and custody of her be committed to him."

Guided by these lights, we shall direct an order to be entered adjudging that the said Charles Trainer is entitled to the care and custody of said Jane Trainer, and directing her to be delivered to him, as her father, leaving him, like the rest of us, responsible to his conscience and his God, for the manner in which he shall fulfil the trust thus restored to him.