## AHRENFELDT *v.* AHRENFELDT.

BY the settled law of England, the primary right to the custody and control of children, without regard to sex, and with a slight qualification as to age, is in the father. And such is the rule of the courts of common law in this state.

A similar rule prevails in the court of chancery, where the application is by a summary process for the custody of a child, whether independent of a suit to settle the right, or connected with one. But where there is a bill by the wife for a limited divorce, and it is sustained, the *prima facie* right to the custody is reversed. It is in the successful mother, not in the father. The decree, however, does not dispose of the matter absolutely. There is yet a discretion in the court. The question is open whether to give the custody to the mother with a duly regulated right of access to the father, or *e converso*. The court *perhaps* may also have the power to make the children wards of the court with a guardian of the persons, appointed by its decree in a case of a bill for a limited divorce.

*Mr. Nash,* for the complainant.

*Mr. Ellingwood,* for the defendant.

July 10. 17.

THE ASSISTANT VICE-CHANCELLOR :—The bill in this cause was filed for the purpose of obtaining a limited separation between the parties under the clause of the statute which provides that this court may decree a separation on the ground of an abandonment of the wife by the husband, and his refusal to provide for her. (2 *R. S.* 147, § 51, sub. 3.)

An order of reference was made at the hearing, directing the master, among other things, to inquire and report whether the complainant or defendant is the most fit and proper person to have the charge of the infant children, having regard to their age and sex respectively, as well as their interest. The master has reported that, in his opinion, the complainant is the most proper person to have this custody. To this report exceptions have been taken on behalf of the defendant.

1840.

Ahrenfeldt
*v.*
Ahrenfeldt

The question raised is of a most embarrassing nature. The future woor welfare of the children may depend upon a right determination. The materials to form a correct judgment are in their nature less precise than in ordinary questions of property. The purity of moral character, so often faintly revealed in actions, and so often mistaken or misrepresented by witnesses, is to a great extent the basis of decision; and it is notorious, that in quarrels of this character the passions of the litigants are continually infused into witnesses; who for the most part are personal friends, constantly beneath the influence of the story of wrongs, fancied or actual. They are partisans before they become witnesses.

I take it to be the settled law of England, that in the first instance, the custody and control of all children without regard to sex, and with a slight qualification as to age, belongs to the father. This point has been strenuously contested before me; and a reference to some of the leading cases appears advisable.

To establish the general doctrine it may suffice to refer to the great cases of Mr. Wellsley, of the *Marchioness of Westmeath,* and of the *People* v. ————, 19 *Wendell,* 16. The rule has been modified in the courts of common law in England by their refusing to interfere on behalf of a father, and take the child from the custody of another, where his habits and situation render it improper that he should have the control. Thus in a late case of *The King* v. *Greenhill,* (4 *Ad. & Ellis,* 625,) there were three infant children females, of the respective ages of five and a half, four and a half, and three and a half years. The wife had left her husband's house, and gone to her mother's, and had procured the children to be brought to her. Upon a *habeas corpus* sued out by the husband against the wife, it was established that he had lived for some time and was then living in adultery. There were some affidavits as to unfitness of the father, from character and disposition to have the custody of children, and as to the fitness of the wife. On his side his affidavits were produced of an attempt at reconciliation, of his attachment to his children,

and of the fact that the children would lose by family arrangements which would affect their interests ; that the wife had no means of supporting them ; that he meant to remove and keep them in his own hands, where the wife should have access to them ; and that they had never been in the society of Mrs. Graham, with whom it was alleged he lived in adultery. The court awarded the children to the father. The general rule was recognized. Lord Denman said, " the only question then is, what is to be considered the proper custody ? The court has, it is true, " intimated that the right of the father would not be acted " upon, where the enforcement of it would be attended " with danger to the child as where there was an appre- " hension of cruelty or of contamination by some exhibi- " tion of gross profligacy." The fact of the illicit connexion was held not sufficient to justify the refusal of the custody to the father ; there being no pretence that the woman was to be in the house to which the children were taken.

In the case of the *People ex rel.* v. *Mercein*, (Aug. 26, 1839,) the chancellor said that the writ of habeas corpus was not the proper mode of trying the legal right of a party to the guardianship of an infant. The court upon such a writ would exercise its discretion in disposing of the custody of the infant upon the same principles as regulate the exercise of a similar discretion by other courts and officers. The child was 21 months old, and the · chancellor said : " The mother, all other things being " equal, is the most proper person to be intrusted with such " a charge in relation to an infant of this tender age."

The decisions, together with the numerous important cases referred to by Chief Justice Nelson in the case before mentioned, prove the rule to be clearly settled in England, that with perhaps the exception of very early infancy, there is no equality of right between father and mother ; but the claim of the former is paramount. They prove that he will always be aided in its assertion ; unless his conduct is such, as that it would endanger the bodily or moral welfare of the child. The learned chief justice considers that the provision of the Revised Statutes has

gone one step further and remedied a difficulty at common law, where the father has the actual custody, in taking it from him, in cases of a separation induced by his mis-behaviour or by consent, without a judicial decree of divorce. (2 R. S. 148–9, § 1, 2.) And he holds that the power given by the statute is not exercised where the wife, without excuse, has abandoned the family, and were no well founded objection exists to the custody remaining with the father. The question under this statute remains therefore, I apprehend, entirely open for the discretionary judgment of the court, to be influenced by the numerous considerations of character, competency and pecuniary situation which must enter into it. The remarks of the chief justice at page 19, are just and impressive. The statute has in truth recognized in this enactment the rule of common law. It may be remarked that there was the same provision in the act of 1815.

There are several cases in the courts of our own country however, weakening this English rule. In the *Commonwealth* v. *Addicks and wife*, (5 *Binney*, 520.) Upon a habeas corpus two infant daughters were brought up in the custody of the mother. One was ten and the other seven years old. Lee, the father, had obtained a divorce *a vinculo* from Barbara, now the wife of Addicks, on the ground of adultery committed by her with Addicks. It was established to the satisfaction, that the mother was educating the children well, and in all respects behaving properly to them. The court held that they were not bound to decide who was entitled to the guardianship, but only to free the children from illegal restraint. That they might deliver the infants to the custody of a particular person if the circumstances required it. And that considering their age, the mother should have the custody. In accordance with this decision is that of *Ex parte Wollstoncroft*, (4 *Johns. C. R.* 80, 332,) and in the *Matter of Waldron*, (13 *Johnson*, 418.) The court will not undertake to decide the question of guardianship upon its summary proceeding; but will free the infant from restraint, and refuse to interfere and assert even a father's

right where it appears discreet to do so. It is very clear however, that upon a habeas corpus our court has paid much less respect to the authority of a father than is done in England. In the case of *the State* v. *Smith*, 6 *Greenleaf*, 462, the question arose upon a habeas corpus. The husband and wife had separated, and by the articles the children were to be left in the custody of the mother. She lived with her father, and the children were of an age to require her care. They were ordered to be delivered to her. The court however went further, and held that independent of such articles it would act, the father having in no case a vested right to the exclusive custody of his children.

That this position cannot be supported in its latitude in England or in our state, is, I think, clear. The father has *prima facie* a right to the custody—a right to be displaced by circumstances.

In this review of the authorities we are to separate all those which arise upon a habeas corpus from other classes. In the former the court refuses to pass upon the question of guardianship. But this court, upon applications for an appointment, as well as upon decrees of separation—and the supreme court upon voluntary separations without decree, must enter upon the question.

Carefully considering all these decisions, I cannot but conclude that the doctrine of the common law has not been overthrown, although it has been weakened in the United States; that still upon a question of guardianship, with the exception of very tender infancy, a positive unfitness in the father must be shown before children can be withheld or withdrawn from his charge. The law pays a tribute to the feelings of nature in supposing that sufficient tenderness will be felt towards a child to insure its well being. In the absolute power of life and death permitted to Roman fathers; (*Taylor's Civil Law*, 402;) in the right of imprisonment still recognized, though abridged, in the civil code of France; (*Code Civile, tit.* 9, 376;) and in the authority of Jewish parents, to have a rebellious son stoned to death upon complaint to the elders, (Deut., c. 21, v. 18, &c.,) we may trace the presumption that

*1840.*

Ahrenfeldt
*v.*
Ahrenfeldt.

paternal feeling was a sufficient substitute for legal protection. From these considerations the law in estimating a father's fitness, cannot regard numerous minor defects of character, or loose and irregular habits, short of vices. Neither can it require a temper perfectly subdued and regulated; or morals elevated and stainless; or a life of religious purity. It must be sufficient if the passions are not so vehement as to subject the child to personal injury, or the character so profligate as to menace its moral ruin.

But in the year 1813, legislative provision was made for the obtaining, through the court of chancery, a limited divorce upon various grounds; and by a statute passed in 1815, the court was authorized upon decreeing a separation, to make such order for the custody of the children, as it should think proper.

The language of the present act is, that in any suit brought by a married woman for a divorce, or for a separation from her husband, the court may, during the pendency of the cause, or at its final hearing, or afterwards, as occasion may require, make such order as between the parties, for the custody, care and education of the children of the marriage, as may seem necessary and proper; and may vary and annul the same. (2 *R. S.* 148, § 59.)

I look upon this statute, especially where a decree has been pronounced for a separation, as neutralizing the rule of the common law; as annulling the superiority of the *patria potestas*, and placing the parents on an equality as to the future custody of the children, even if it does not create a presumption in favor of the wife. And this is the case, because no decree for a separation can be pronounced, without evidence of such a violation of duty in one relation of life, as implies a probability of the disregard of every other.

But it is not possible to adopt the position of the complainant's counsel that a decree against the husband disposes of the matter. The statute leaves a discretion in the court; and no one can have been conversant with such cases, without seeing that many whose conduct towards a wife has justified the interference of the court,

yet evince sufficient affection towards their children, and bear a character in society of sufficient estimation, to warrant their having the control. There was a case before Chancellor Dessaussure, strikingly exhibiting the pressure of the common law doctrine upon this court.

In *Prather* v. *Prather*, (4 *Dess.* 33,) upon a bill filed by a wife living separate, for alimony, on the ground of ill usage, the court said that the bill made a very shocking case—outrageous to humanity, and disgraceful to civilized society. The bill prayed, that the two sons of the marriage might be put out apprentices, with liberty of access to the mother, and that a daughter might be delivered to her. The Chancellor said: "With respect to the children, "I do not feel at liberty to take them out of the custody of "the father. He is the natural guardian, invested by God "and the law of the country, with reasonable power over "them. Unless, therefore, his paternal power has been "cruelly abused, this court would be very cautious of in- "terfering with the exercise of it. No allegations of "cruelty to the children are made in the bill."

This was upon a demurrer. Testimony was afterwards taken, and with other abusive treatment it was proven, that the defendant had whipped his wife. The court said, with respect to that part of the prayer, relating to compelling the defendant to surrender the infant daughter, the court is apprized that it is treading upon new and dangerous grounds; but feels a consolation in reflecting, that if it errs there is a tribunal wherein the error can be redressed. The infant daughter was ordered to be given to the mother. (See also *Williams* v. *Williams*, 4 *Dess.* 183.) It should also be noticed, that the court, where there is a cause pending, will permit its decision to be influenced by many circumstances, which it will not regard where the question arises upon a *habeas corpus* merely. (*Anon.* case cited 1 *Jacob's Rep.* 254, *n.* b.)

It may be also the case, that under our statute, this court might make the children wards of the court, appointing a guardian of their persons and estate, and regu-

1840.

Ahrenfeldt
*v.*
Ahrenfeldt.

Ahrenfeldt
*v.*
Ahrenfeldt.

lating the right of access of both parents. I pass over, however, this important question, as it does not now arise.

I have gone through the great mass of testimony adduced by the parties. I am satisfied that the defendant is worthy to be intrusted with the charge and education of his children. The accusation of libertinism and infidelity entirely fails. The charge of neglect of a child who was on its death bed, is better supported. Yet the testimony is only, that *they let him know the child was poorly*, before it died, and sent for him after its death. The information appears to have been given once, and how far calculated to excite alarm, does not appear. As to the charge of gross neglect of supplying the means of support, I had occasion, when the cause was before heard, to examine the evidence minutely. There was great exaggeration in the statements of witnesses, although the conclusion I came to was, that the allowance he made was scanty and penurious.

I cannot pass by the highly important consideration that the defendant is a merchant, enjoying a very respectable situation in the community; doing a valuable business, and worth, it is now stated, $20,000. It may reasonably be supposed that the fruits of his labor, if bestowed upon his children, will insure them a competency. And I cannot but perceive that if the exclusive custody is given to the mother, even with a right of access to the father, there will ensue that alienation of affections which will prejudice their prospects. It must be believed that his visits to the house of the mother, will grow less and less frequent; his affections gradually wane; that other objects of attachment may supersede the hold of his children; and that while they are surrounded by her friends, deeply imbued with personal dislike to him, no feeling of love or deference can be cultured in their hearts.

While these considerations must be weighed on behalf of the father, it is undeniable, that upon the evidence before me, the mother is perfectly unobjectionable for the care of her children, at least of children still so young. Looking with much anxiety to the due discharge of a very responsible duty, I shall make an order, (for which,

however, the assent of the defendant will be necessary,) to this effect.

That upon the defendant stipulating to bear the expense, the eldest child be placed as a boarder in such public female school in the city of New-York, or in the county of Queens, as the defendant shall designate, and a master approve. That such master ascertain what proportion of the sum of one hundred and twenty dollars allowed for the support of each of the children, would be proper to be allowed for the clothing of such child ; and that so much as he shall think proper for that purpose be paid to the complainant in quarter yearly payments to be applied by her for that purpose. That such master, in conjunction with the principal or superintendent of such school, settle a scheme for the access and communication of the complainant and defendant to and with such child ; that he also settle a plan for the residence of such child during the recess or vacation of such school, and in case he find the parties respectively in unobjectionable residences, that he divide the residence of such child as near as may be equally between them.

That as to the younger child, she remain until further order in the custody of the complainant. That such master settle a plan of access by the defendant to her, under the supervision of some proper person, and by conveying the child to the residence of the defendant at and for such reasonable times as he shall judge proper.

That the defendant be restrained from removing the children out of the jurisdiction of this court, and give security to the satisfaction of the master not to do so. And that either party may apply to this court whensoever advised, for further directions in the premises.

The decree as above proposed not being assented to, the order was finally made, confirming the master's report, and decreeing payment of the alimony and costs.