# Law and Equity

### IN THE

# SUPREME COURT

### OF THE

# STATE OF NEW YORK.

THE PEOPLE, *ex rel.* Olmstead, *vs.* OLMSTEAD and RANDELL.

By the common law, a father has the paramount right to the custody and control of his minor children, and to superintend their nurture and education. The same rule exists in this state.

But this superior legal right of the father is subject to the control of a court of equity, in two cases: 1. When the father has abused or forfeited the right by cruelty or misconduct towards the child, or his character is such, or he has been guilty of such conduct, that the welfare, either physical or moral, of the child requires that such child shall be removed from the father.: 2. When the father and mother are living separate from each other, under such circumstances as would warrant the court in granting a divorce *a mensa et thoro*, and the welfare of the child requires that it should reside with the mother.

Where a separation between the parents has taken place, without any fault on the part of the husband, upon whose character there is no imputation; and there is no objection made to his fitness for the proper discharge of his parental duties; and the evidence does not show any ground on which a court of equity could decree a separation of his wife from him, for any cruelty, unkind treatment or neglect, the custody of the child will be given to him.

When the mother has been at fault in the occurrences preceding the separation, she should not be rewarded for her faults by the interposition of the court. If she breaks up the household, and departs from her husband's house, wrongfully, whether it be done of her own purpose, or from weakly yielding to the evil influences of others, she is not to be allowed to take with her the children of the union.

THIS was a proceeding by *habeas corpus*, instituted by a father, against his wife and mother-in-law, to obtain the possession of his infant child, and to have the care and custody of said child committed to him. The petition of the relator stated that on the 20th of February, 1855, the petitioner legally married Maria N., the daughter of the defendant, now Mrs. Randell, widow; that he was thirty years of age, and his said wife about twenty-four years of age, and that she had no brother or sister living; that said Mrs. Randell had no child living except the petitioner's wife; that said Mrs. Randell, and the petitioner's said wife, and the petitioner, all resided in the city of New York at the time of such marriage, and that the marriage ceremony was performed there; that the petitioner and his said wife, Maria N., had one child only, an infant son, who was born on the 22d day of November, 1855, in said city; that said Mrs. Randell had persuaded the petitioner's said wife to leave him and remain absent from him, without any just cause therefor on his part, and in opposition to his wishes, most of the time since his marriage; that the petitioner's said wife came to him seven days before the birth of her said child, from Bridgeport, Connecticut, and resided with him in said city of New York at the time said child was born, but that she left him again and took away the child within two months thereafter, without his consent, and had continued to remain away from the petitioner with said child ever since, without his consent; that when his wife left him after the birth of his said child, he called to see his child several times, but was always obliged to see it in the apartments of Mrs. Randell

and his wife, contrary to his wishes; and that the petitioner has found it impossible at times to see the child at all; that he did not see his said child from the 6th day of April, 1856, until the 15th day of November, 1856, when the child was produced in court, on the return of a writ of *habeas corpus*, issued by the city judge of the city of New York, during a short visit of Mrs. Randell and Mrs. Olmstead to said city, of which visit the petitioner incidentally became informed; that from the 18th day of April, 1856, until the 13th of November, 1856, said Mrs. Randell and the petitioner's wife had resided with said child out of this state, in Connecticut and other places in New England; that on the 6th day of April, 1856, he saw his wife and she then expressed a desire to live with him, and that the petitioner then asked her to live with him, and return the said child; but she was influenced not to do so, as the petitioner believed by her mother, and the bad advice of other parties not related to them. The petitioner further stated, that since his said marriage, that is, since February 20, 1855, Mrs. Randell had changed her place of abode or boarding-house no less than 19 or 20 different times, visiting for brief periods during that time New York, New Brunswick, Saratoga, Clinton, Ballston, Green's Farms, Stamford, Norwich, Bridgeport, Portland, Brooklyn, and taken petitioner's said wife and child with her to most, if not all, the said places above mentioned, and never remaining long at any one place; and that the petitioner's wife, on account of being with him occasionally previous to the birth of said child, has changed her boarding place much oftener; and that Mrs. Randell has no fixed place of abode; and the petitioner believed such constant changes, and the excitement usually attending them, would be detrimental to his wife and child if persisted in. The petitioner stated, that he believed said Mrs. Randell to be wholly unfit, for various reasons, to have the charge or control of either herself, or the petitioner's wife or child; and he did not believe her to be in a sound state of mind; and that it would be very wrong and to the great injury of the said child, that petitioner's

The People *v.* Olmstead.

wife should, for any length of time, have the custody of the said child, or the care of its health, or education, or habits, especially in conjunction with her mother. That the petitioner's wife had said she considered it her duty to remain with her mother, but the petitioner alleged that several experiments had proved it unadvisable for Mrs Randell to reside in the same house with his family. That since the 19th January, 1856, the petitioner's wife had lived in a state of separation from him without being divorced, or any proceedings taken therefor, to his knowledge, and without the petitioner's consent or concurrence, and against his will; and that several times since she left him, the petitioner had requested his said wife, personally and by letter, to return to him with his said child, but that she still refused so to do. That the said Mrs. Randell harbored the wife of the petitioner, and was accessory to the detention of the said child, as the petitioner was informed and believed; and that said Maria N. the petitioner's said wife, had no property of her own or under her control, with which she could support herself or said child. The petitioner stated that he had always provided for his wife and child in a suitable manner while they were living with him, and was able to do so, and that they were being so supported by him at No. 45 Grove street, in the city of New York, on said 14th January last, when his said wife left him. The petitioner further averred that he was apprehensive if he did not now obtain the custody or control of his said child, that said child would soon be removed from this state and its jurisdiction. That said infant child of the petitioner was restrained in his liberty by the said Mrs. Randell and Mrs. Olmstead, the wife of the petitioner, at No. 61 Nassau street, in the city of Brooklyn, in the county of Kings, and that said child was not committed or detained by virtue of any process issued by any court of the United States, &c.

A writ of *habeas corpus* was issued upon this petition, and the *infant* child having been produced in court, upon the return day thereof, the defendants filed their separate returns,

The People *v.* Olmstead.

in which they severally denied most of the facts set forth in the petition. The wife, in her return, among other things, alleged that the petitioner had treated her with great cruelty and unkindness; that she had been obliged to fly from him, and take refuge with her mother; that she had no desire, and would consider it dangerous to herself and child, to live again under the same roof with her husband; that the child was not yet weaned, and needed a mother's care; that with the assistance of Mrs. Randell, her mother, she was able to provide for herself and child, comfortably; that her mother, so far from being unfit was the most proper person to have the care of the deponent and her child; and that the petitioner was unable to support, comfortably and respectably, himself and his wife and child. She denied that the child was restrained of its liberty by Mrs. Randell or herself; or that the petitioner had been unable to see the child whenever he wished; or that there was any ground for apprehension, on the part of the petitioner, that the child was about to be removed from the state, or beyond the jurisdiction of the court. And she alleged that she had commenced a suit against the petitioner, in the superior court of the city of New York, for a limited divorce, on the ground of his ill treatment of herself and child. Mrs. Randell also made a return to the writ, in which she denied the allegations of the petition. The petitioner put in separate replies to the returns, putting in issue the matters severally stated in the returns. The issues were tried by the court, before Justice BIRDSEYE, and after argument of counsel, the following opinion was delivered, and judgment ordered.

*H. W. Johnson* and *D. McMartin,* for the relator.

*R. Goodman* and *J. M. Van Cott,* for the respondents.

BIRDSEYE, J. That the father has, by the common law, the paramount right to the custody and control of his minor children, and to superintend their education and nurture, is too well settled to admit of doubt. Such has been his ac-

knowledged right in England, from the earliest period at which it became the subject of judicial investigation, down to the present time. (*Ex parte Hopkins*, 3 *P. Wms.* 151, 154. *See The King* v. *Johnson*, 2 *Ld. Raym.* 1333; 1 *Strange*, 579, *S. C.*; *Blissett's case, Lofft*, 748; *The King* v. *De Manneville*, 5 *East*, 221; *De Manneville* v. *De Manneville*, 10 *Ves.* 52, 62, 3; *Ex parte McClellan*, 1 *Dowl. Pr. Ca.* 81–84; *The King* v. *Greenhill*, 4 *Ad. & Ellis*, 624, 640; *The King* v. *Isley*, 5 *id.* 441; *Ex parte Skinner*, 9 *J. B. Moore*, 278; *Wellesley* v. *Duke of Beaufort*, 2 *Russ. Ch. Rep.* 1–18; *Ball* v. *Ball*, 2 *Sim. Rep.* 35; *The Queen* v. *Smith*, 16 *Eng. Law and Eq. Rep.* 221; *Ex parte Woodward*, 17 *id.* 77; *In re Hakewill*, 22 *id.* 395, 400, 402. *See also Hargrave's Notes*, 66 *and* 70, *to Co. Litt.* 88 *b. ; Forsyth on Custody of Infants*, § 6, &c. ; *Shelf. on Marriage and Divorce*, 677, &c.) The same rule exists in this state. The correctness of the English decisions on the subject has been expressly recognized here. (*See The People* v. *Chegaray*, 18 *Wend.* 637, 642, 3; *The People ex rel. Nickerson* v. ——, 19 *id.* 16; *The People* v. *Mercein*, 8 *Paige*, 47–56; *Mercein* v. *The People*, 25 *Wend.* 64, 72, 398, 101; *The People* v. *Mercein*, 3 *Hill*, 399, 410, 418, 420, 422, 425; *The People* v. *Cooper*, 8 *How. Pr. Rep.* 288, 293; *Ahrenfeldt* v. *Ahrenfeldt*, 1 *Hoff. Ch. Rep.* 497; *The People* v. *Porter*, 1 *Duer*, 724. *See also* 2 *Story's Eq. Juris.* §§ 1341, 2, &c. ; 2 *Kent's Com.* 186, 7, 213, 8*th ed.*) As has been well said, (19 *Wend.* 18,) "So fully does the law recognize the authority of the father on this subject, that he is permitted to perpetuate it beyond his own life; for he may, by deed or will duly executed, dispose of the custody of such (his) child during its minority, or for any less time, to any person or persons, in possession or remainder." 2 *R. S.* 150, § 1.) And by the following section such a disposition is declared "valid and effectual against every other person claiming the custody or tuition of such minor, as guardian in socage, or otherwise." The principles embodied in this statute are derived from the Stat. of 12 *Car. 2d c.* 24, §§ 9, 10, 11.

In *The King* v. *Johnson*, (*ubi supra*,) the right of a testa-

mentary guardian, appointed by the father's will, to the custody of the infant, was sustained by the king's bench upon a *habeas corpus*, in 10 *George I., A. D.* 1723. In that case, the child was taken away from the guardian duly appointed, as it would appear, by the spiritual court. To the same point is *The King* v. *Isley*, (5 *Ad. & Ellis*, 441.)

But while such is the general rule, it is equally well settled that this superior legal right of the father is subject to the control of a court of equity in two cases: 1. When the father has abused or forfeited the right by cruelty or misconduct towards the children, or is of such character, or has been guilty of such conduct, that their welfare, either physical or moral, requires that they shall be removed from him. (*The King* v. *De Manneville*, 5 *East*, 228, *per Ld. Ellenborough and Lawrence, J., and Lytton's case there cited;* 10 *Vesey*, 61, 2; 4 *J. B. Moore*, 278; 4 *Ad. & Ellis*, 641, *per Ld. Denman, J.; Wellesley* v. *Duke of Beaufort*, 2 *Russ.* 1; 18 *Wend.* 643; 19 *id.* 16; 25 *id.* 105; *and other cases cited above.*) 2. Where the father and mother are living separate from each other, under such circumstances as would warrant the court in granting the wife a divorce *a mensa*, and the welfare of the children requires that they should reside with the mother. (2 *R. S.* 148, 9, §§ 1, 3; 17 *Eng. Law & Eq. Rep.* 77; 19 *Wend.* 18; 8 *Paige*, 53; 2 *Russ. Ch. Rep.* 1, *and cases cited above.*)

I am aware that there are dicta in some of the authorities cited, and in other cases in the books, which, at first view, appear to contradict the general rule of the paramount right of the father, as I have stated it, and which apparently overrule some of the authorities above cited to sustain it. I think, however, it will be found, on examination, that none of these cases are really at variance with the cardinal principle. They proceed, either upon the form of the proceeding and the nature of the remedy invoked, or upon one of the two classes of exceptions above adverted to.

The cases of the first character are well illustrated in *The*

*King v. Penelope Smith,* (2 *Strange,* 982.) There the court of king's bench, while admitting the father's right of guardianship, refused to determine it upon *habeas corpus,* but referred the father to his appropriate *action* for that purpose. But in *The King v. Delaval and others,* (3 *Bur.* 1464-6,) Lord Mansfield said, in substance, that the refusal of the court in Penelope Smith's case to deliver the infant to the father, was based on some unfitness in the character or conduct of the father, "of whose *design* in applying for the custody of his child they had a *bad* opinion." And the chief justice approved of the decision in *The King v. Johnson.*

The cases of the second character are illustrated in this very case of *The King v. Delaval,* where Lord Mansfield, speaking of the powers and duties of the court upon *habeas corpus* to dispose of the custody of infants, says: "The true rule is, that the court are to judge upon *the circumstances of the particular case,* and to give their *directions accordingly."* To one or the other of these decisions may be referred, (besides the cases of *The King v. Penelope Smith* and *The King v. Delaval,*) the following authorities: *Matter of McDowles,* (8 *John.* 328.) *Matter of Waldron,* (13 *id.* 418.) *Matter of Wollstonecraft,* (4 *John. Ch. Rep.* 80.) *Mercein v. The People,* (25 *Wend.* 102, &c., per *Paige, senator.*)

Such being the general rule, and the exceptions to it, the questions here presented are, (1.) Whether the relator has forfeited his parental rights by cruelty or misconduct towards his child, or whether he is of such a character that the interests of the child require its removal from under his influence. (2.) Whether his wife has separated from him under such circumstances as would warrant this court in granting her a limited divorce, and whether the welfare of the child requires that it should reside with the mother.

The first question may be very briefly dismissed. During the whole of this long and angry litigation, it was not alleged that Mr. Olmstead had been guilty of any one act of cruelty or misconduct to his child. Indeed, as the latter was not two

months old when removed from him by its mother, there was no room for such a pretense. The character of the father is as free from objection as is his conduct towards the child. Although, during the earlier stages of this long and painful controversy, the respondents made some charges against him, these were wholly unsustained by the proof. And the counsel for the respondents distinctly admitted, in the summing up, that, upon the proof in this case, there was no objection to the entire fitness of the relator for the proper discharge of his parental duties, except such as were claimed to arise out of the difficulties between him and his wife. This admission was perfectly proper. Indeed, upon the proof here, no counsel could have dared seriously to deny that the relator was every way a proper person to take charge of this child, as its father. I consider his moral character not only as not impeached, but in fact as unassailed. Aside from the difficulties between him and his wife and her mother, there is no imputation upon his character. He has displayed very great affection for the child; is shown to be in the receipt of a very respectable professional income; his habits are correct; his disposition is kind; and in my judgment he is in every way well fitted for the exercise of his parental duties.

The second question naturally divides itself into two parts, (1.) Has this wife separated from her husband under such circumstances as would warrant this court in granting her a limited divorce? If she has, (2.) Does the welfare of the child require that it should reside with the mother? As to the first inquiry, my opinion is clear that the evidence does not show any ground whatever on which a court of equity could grant Mrs. Olmstead a limited divorce, for or on account of any cruel treatment by her husband. Not a single act of cruelty or unkindness is proved, or even alleged, against him. He has never lifted his hand against her. It is not shown that he ever spoke or wrote to her an angry or unkind word. He provided fully for her while she would reside with him. She left him against his wishes. The whole proof shows that a

very warm attachment subsisted between them, down to a period very shortly before the separation. Her letters to him, which were very frequent, down to within two months of the final separation, (during which latter period no letters passed, as they were living together,) display an ardent affection on her part towards him. They show that she was still extremely desirous of living with him, and was only kept from so doing by foreign influences. As late as April, 1856, which was three months after the separation, she is proved to have spoken very affectionately of her husband, and to have said that she had not lost all her affection for him; that she still hoped to live with him at some future day; that he had always done every thing for her to the extent of his means, and she fully appreciated it. And such expressions and feelings were, in my judgment, abundantly merited by the uniform kindness and affection with which the relator is shown to have treated her.

The proofs adduced here compel me to say, without disguise, that the sole cause of these unhappy differences, and of the entire disruption of what would otherwise have been, so far as I can conceive, a harmonious family, is to be found in the character and conduct of the respondent Mrs. Randell, the mother-in-law of the petitioner, and in her baneful influence over the character and conduct of his wife. From an early period after the marriage, Mrs. Randell is shown to have entertained great aversion to the petitioner, and to have expressed it very freely to him and to others. No good cause for this was assigned. Her alleged reasons were altogether frivolous. They were, that he talked too much of his family and friends; that he loved his wife too much; that he was jealous of Mr. McKeon; that, on the evening when he reached Washington with his wife, on their bridal excursion, he gave the coachman a gold half eagle instead of a silver quarter of a dollar, and was a careless fellow. These difficulties came to an open rupture, at the scene in Holdridge's Hotel, in May, 1855, less than three months after the marriage. The parties then occupied a suite of rooms, consisting of a parlor, and two sleep-

The People *v.* Olmstead.

ing rooms which both opened into the parlor. The mother-in-law undertook to compel her son-in-law and daughter to sleep with the door between their bedroom and the parlor, open during the night, the door of her own room being also open. When he attempted to close his door, Mrs. Randell personally resisted him, rising from her own bed for that purpose, and being then only in her sleeping gown. Mrs. Olmstead told Mrs. Murray, very nearly a year afterwards, and in the presence of Mrs. Randell, that "that was a disgraceful affair all around, and that she never wished to hear it spoken of again." That this was its character, so far as Mrs. Randell was concerned, admits of no doubt. It is probable the same remark will apply to it, so far as Mrs. Olmstead herself took part with her mother in preventing Mr. Olmstead from shutting the door. It may be, although there is no proof on this subject, that when he found that requirement made, in that manner, he was not as patient and forbearing as he might have been. But such conduct was most indelicate and improper on the part of the mother-in-law. It was of a kind well calculated to irritate him. Her character and conduct, both before and afterwards, justify the conclusion that such was her deliberate design. The proof, however, fully satisfies me, that while the relator did, as he might properly, insist that his wife's mother should not sleep virtually in the same apartment with them, he-yet did not raise his hand against, or use any violence to her. The assertion that he struck her, which Mrs. Randell afterwards repeated so many times, is disproved by the direct evidence, as well as by the subsequent statements of the affair which Mrs. Olmstead gave. The fall which Mrs. Randell then sustained, was owing to the state of extreme anger and passion in which she was when she clutched at the handle of the door, as it was being shut. Her hand then slipped from the knob, and she fell. The true key to the whole transaction may, I think, be found in what Mrs. Randell said but a short time afterwards, viz: that after the fall, or, as she called it, the "knocking down," the alarm was given

throughout the house, the physician was sent for, and that she was determined to lie there till the doctor came, to let him see her there; and that she wished he, Olmstead, had struck his wife, and then she could have got a divorce. From the state of feeling which this collision produced, it is clearly proven that Mrs. Randell never has recovered. She has ever since entertained most bitter feelings towards her son-in-law, and all his family and friends, and has taken little pains to conceal or suppress such feelings. She made that occurrence the ground for an immediate separation between the husband and wife. She did very much, if not her utmost, to prevent the reconciliation which the husband and his friends at once took such great pains to bring about. And when, with great difficulty, and only by the most urgent persuasion, it was brought about, she suddenly insisted on breaking it off, not by reason of any new occurrence, but because she had bethought herself of some former remark of Mr. Olmstead's, which she deemed offensive to herself. She was, however, induced to give up this idea, and her consent was at length obtained that her daughter might again live with Mr. Olmstead; but she persisted that *she* herself would not be reconciled to him. The proof shows that she has adhered to this determination. It does not appear that she has ever since spoken kindly to him or of him. Very soon after that occurrence, she withdrew with her daughter to the country, and the husband and wife were in fact separated the most of the time till the middle of the next November, a period of about five months. The letters written by Mrs. Olmstead to her husband during this interval, as already stated, breathe a very warm spirit of attachment. They also show, unmistakeably, that Mrs. Randell was anxious to hinder, if not to cut off entirely even that correspondence; that she was unwilling the wife should write to her husband or receive letters from him; and that when such letters were received, she was displeased if the husband's letters contained any expressions of affection towards his wife. And there are not wanting, throughout these letters, most sig-

nificant warnings and expressions and statements on the part of Mrs. Olmstead, that the continuance of this correspondence subjected her to such tokens of severe displeasure, if not of anger, that she was compelled either to relinquish it, or to carry it on in secret, even while her mother slept. From an expression in one letter, that of June 27, 1855, it appears that this letter was written by stealth, while the mother was asleep; that a hint dropped unintentionally the day before, of a design by the daughter to write to her husband, had induced the mother to keep constantly with her, so as to prevent her from writing. "Since then," the wife adds, "*mum* has been the word; but I have been keeping up," &c. &c. That this state of feeling continued some time is obvious from the next letter of June 28, 1855, in which the unhappy wife says: "It seems the slightest thing now-a-days makes unpleasantness. I am constantly doing wrong, and cannot look into futurity. Would that I could, a little! You must not be surprised to get this. What is to be done? Ma is packing, she says, to go somewhere to-morrow, and very angry." And, in fact, they seem to have left New Brunswick that very day, or the day after, contrary to their intentions, and under the influence of the feelings here disclosed. And yet, during the earlier part of their stay at New Brunswick, Mrs. Randell was returning thanks through her daughter's letters, for presents of bottled ale sent her by her son-in-law, and was informing him in the same manner when her supply of ale was out and needed replenishing from the city.

The occurrences which took place at Clinton, during the first visit after marriage, which the husband made with his wife and wife's mother, at his father's house, are very fully proved by a most respectable witness who is wholly uncontradicted. They are indeed most remarkable. On the very day, or the day after, Mrs. Randell entered the house, the whole family was in disturbance; she found visiting there certain relatives of the family, in regard to whose past life she had heard some reports. Entire stranger as she was, she accosted

them, and recounted to them the whole story, though it had been past and gone for nearly thirty years, if it had ever had any foundation in truth.    She objected to the table, and within an-other day or two, she first refused to go to the table, and then left the house during a storm, and betook herself to an inn in the vicinity, and that not one of the first class.    She herself subsequently spoke of it as a "second or third rate tavern." That she went in anger, is obvious.    That her conduct there was, at least, very singular, is equally obvious ; for she so conducted herself that she was taken for crazy by the hostess or some of the servants.    But, whatever was obscure on the direct proof, her own declarations to Mrs. Scott at Ballston, shortly after, remove all doubt from her conduct and her motives.    She must have gone to Clinton with the deliberate design of quarreling with her son-in-law, and all his family. Beyond doubt, she fully accomplished her purpose so far as any acts of her own could ; for I find no proof of any single unkind word, or inhospitable act or expression, or even of any recrimination, on the part of any of her son-in-law's kindred to her.    Nor does it appear that she ever alleged the existence of any such thing, although these occurrences at Clinton were the topic of frequent conversation by her for months afterwards.    The suggestion of her own insanity she treated as a joke.    The inquiry put to her by a servant, "How long have you been crazy ?" seems scarcely to have attracted her attention; and it was remembered at all, apparently, rather because it was evidence of the extent and nature of the difficulties she had caused.

The scene at the church in Clinton on the sabbath day before commencement, is a most singular proof of the length to which passion will carry even those who generally maintain a reputable standing in society.    The accounts of this transaction are derived from her own lips.    As she said, she dressed herself at the tavern in the best of her wardrobe, putting on her best laces, &c., and went to the church "determined to show them all what she was, and that she could dress as

well as any of them." She rose in her pew, as her son-in-law passed through the aisle accompanied by his wife and his father's family, and bowed to her daughter, and accosted her in a triumphant tone, as if to show she was not, and could not be put down; or, as she herself said, "to show that she had carried out her plans triumphantly." And she used to laugh very often when she was talking over this affair subsequently. Well might she say, as she afterwards did, that such conduct "almost killed" her daughter; that in church, "She looked almost as if she would sink through the floor;" that "She left Clinton before commencement, through mortification and chagrin." And it is clearly proved that on the next day the husband and wife fled precipitately, cutting short their visit to his friends, and refusing to remain and attend the commencement at the college, and its attendant festivities, where the conduct of Mrs. Randell had attained such unpleasant notoriety. It was but a few days after, when Mrs. Randell reached Ballston, alone; her daughter being still with her husband. Directly on her arrival, she (Mrs. Randell) repaired to Mrs. Scott's room, and then, and very frequently afterwards, spoke of these occurrences. Her language and conduct at this time disclose, I doubt not, her true character, and show who has been the party really at fault during these unhappy differences. She said she went to Clinton, to "spite and to plague the family." That she wanted to go back there again "to annoy the family, to plague and spite them." She spoke of her "adventures" at Clinton, and said she had had a "great time there." She had "liked the fun of it." She even offered to pay the board of Mrs. Scott, at Clinton, if that lady would return there with her. The "fun," however, was not to the taste of the latter, and the invitation was not accepted. For weeks, the occurrences at Clinton were the subject of frequent conversation and comment by Mrs. Randell. She would, as the witness states, "often speak of them, and laugh over them." She gave, as a part of the causes which led to the difficulties,

at the house of Mr. Olmstead, senior, the fact that she "did not like the table;" that "the bread was too dry, and there was no warm biscuit." She said she felt slighted, and was not quite satisfied with the house, and the attention she received. During this stay at Ballston, her conversations were "rambling and excited." In very many of them, she spoke of Mr. McKeon as the one who ought to have had her daughter, and as the one whom she herself preferred for her daughter's husband. She spoke of procuring a separation between Mr. Olmstead and his wife, for the purpose of having the latter. marry McKeon. And after Mrs. O. came from New York, whither she had gone with her husband from Clinton, and joined her mother at Ballston, Mrs. Randell was trying to induce her to leave her husband, and offering, if she would do so, to buy her wardrobe and pay her bills,. and support her and her child. This, it was proved, was the topic of frequent conversation by Mrs. Randell.

I shall not recount at length the scene during the night, at Ballston, between this mother and daughter, of which Mrs. Scott was the witness on the urgent solicitation of the latter. The origin of the difficulty seems to have been the discovery on the part of Mrs. Randell, by stealth, of a letter from Mr. Olmstead to his wife, using expressions of tenderness, and urging her to return to live with him. From what is stated of the language and conduct of Mrs. Randell on that occasion, she must have been in a state of intense excitement—almost a frenzy. I think a much stronger statement would not be out of place. When the passionate expressions of the mother had terrified the daughter, then rapidly approaching her confinement, so that she said, weeping bitterly, "Mother, you will kill me if you talk so, and not only me but my child," Mrs. Randell replied, "There is no danger of that. You treated me like a brute in leaving me at Clinton. There is no danger of killing you.". And when Mrs. Olmstead, after some conversation, added that she would, on the morrow, if her life was spared, return to her husband and live with him,

The People *v.* Olmstead.

for she needed a protector, Mrs. Randell replied to her—" Go, go live with him, starve and die in a garret, and I will starve myself. I will not eat again." That such a state of feeling on the part of the mother should have prevented her sharing her daughter's bed that night, as had before been her custom ; should have induced her, in the morning, to rise, dress herself, and go alone to the breakfast table of the hotel, without speaking to her daughter ; and then to pack her things, and prepare to leave the town, without disclosing to her daughter whither she was going, or what were her purposes, was perhaps not strange ; however strange such conduct may be between a widowed mother and her only daughter, and more especially between parent and child as tenderly attached as these parties claim to be, according to the statements made in their returns. Yet such were the facts ; and the mother and daughter left the house that day secretly, while the family were at dinner, Mrs. Olmstead begging her friend Mrs. Scott to make to their friends in the house the best excuse for their departure she could devise.

The full force of the expression which bade Mrs. Olmstead go to her husband, and starve and die in a garret, cannot be apprehended without adverting to one or two facts which are in proof. About this time Mrs. Randell was frequently saying, and probably she believed, that Mr. Olmstead was unable to support his wife, as his income did not exceed $600 or $700 per year, although the proof here is that his income was much larger than that. Before her marriage, it appears that Mrs. Olmstead had transferred to her mother all her own property, some $13,000 or $14,000 in amount, so that the latter could, if she chose, entirely withhold from the former the whole of it, both principal and interest. That Mrs. Randell was well aware of the power which this fact gave her over her daughter, is proved by the expression which she had more than once before that night used to her, during their visit at Ballston—" If you go to live with Mr. Olmstead again, you shall not have a dollar of my money."

It does not appear in proof that there were any other difficulties between this mother and her daughter so serious as those on the night at Ballston here alluded to. But it is abundantly obvious, not only from Mrs. Olmstead's letters, but from the independent testimony of several different witnesses, that there were unfortunate and not unfrequent differences between them. If, as both Mrs. Randell and Mrs. Olmstead declared, the former could not live in the same house with Mr. Olmstead in peace, I think it is clear that she did not live in uniform harmony even with her own and only daughter. The state of feeling on the part of Mrs. Randell towards Mr. Olmstead which has been developed, continued throughout the fall and winter. It is seen in very many of Mrs. Olmstead's letters to her husband; in the many and different arrangements proposed for their residence during that winter; in the final arrangements for returning to New York; in the querulous complaints made by Mrs. Randell to Mrs. Porter and Mrs. Riker, immediately on her arrival, and during her stay at their house; in her conduct on the night of January 14th, 1856, when the final separation took place between the husband and wife; in their leaving the house, after that separation; in the subsequent visit of Mrs. Randell to the house of Mrs. Murray, where Mrs. Olmstead had then gone to board; and generally in all her subsequent conduct.

In regard to the occurrences on the night of January 14th, 1856, when the final separation of the wife from her husband took place, all the witnesses agree that Mr. Olmstead was cool, unexcited and deliberate. His wife was much excited. Mrs. Randell must have been in nearly the same state in which Mrs. Scott describes her to have been at Ballston, during the night in August previous. The difficulty seems to have taken its rise from a conversation between Mr. and Mrs. Olmstead during the night. This conversation had reference principally to the conduct of Mrs. Randell towards Mr. Olmstead. It may have been indiscreet, possibly unkind for him to speak to his wife on that subject. She was, perhaps, not yet fully

restored to her health or strength, for her child was not quite two months old. But that the husband should have remonstrated was not unnatural. It should not have been unpardonable in the view of his wife. He might well speak of a residence separate from a mother-in-law, who, while she would request that he be sent for her ale or other drinks, would not speak to him, and scarcely ceased to revile him, even to the most entire stranger into whose company she might be thrown. She had repeatedly said, during their brief stay in that house, that Mr. McKeon should have been the husband of her daughter, and the father of her daughter's child. In her common conversation she was threatening to procure a separation of her daughter from Mr. Olmstead, even "if it cost her all she was worth," and to have her daughter then marry Mr. McKeon. McKeon was then in the habit of calling familiarly on Mrs. Randell or Mrs. Olmstead, or both of them. He had corresponded with one or both of them during the previous year, and visited them during the fall, at Bridgeport, where they were boarding while absent from the city. It is clearly proved, that during all this time McKeon was a married man. It does not appear whether that fact was known to Mr. Olmstead. It does not seem to have been known to his wife or her mother. McKeon, himself, while he testifies to the fact of his being then married, and that Mrs. Randell had stated to him after her daughter's marriage, that he ought to have married her daughter, also states that he did not disclose the fact of his marriage, to Mrs. Randell or Mrs. Olmstead.

What remonstrances the husband made use of to his wife on the night of the separation, does not appear. It only appears that when his wife subsequently spoke of them, she said she "felt worried by them." Whatever they were, she resented them so much as to make them the pretext for an immediate separation. She arose and threatened to leave him at once, and take with her their child. To her departure he seems to have interposed no obstacle; but he refused to allow her to take away the child, as well he might do, it being then

past midnight. The occurrence was by her communicated to Mrs. Randell, who lodged in a lower room, and who at once became highly excited. She sent for her daughter's relative, Mr. Suydam. She cried from her window for the watch. She sent for policemen. And when the policemen came, she succeeded by their means in obtaining for Mrs. Olmstead the possession of the child. Mr. Olmstead, on being advised by one of the policemen so to do, unlocked the door, admitted his wife again to the room, and suffered her to remove the child. During all this scene below, which is emphatically described by one of the witnesses as a " row," the child remained entirely quiet in its bed. It was not heard to cry by the policemen who went into the room, or by the lady who kept the house, and who stood in deep mortification at the foot of the stairs, hoping for an end of the disturbance and the restoration of quiet to her house. From that night, till this time, the child has been in the sole custody of its mother and grandmother. During the remainder of that week they remained in the same house, but were wholly separated from Mr. Olmstead. At the close of the week, Mrs. Randell left the house secretly, and for a place of destination which she carefully concealed, taking with her, her daughter and the child. This proceeding is for the purpose of restoring to the care and custody of its father a child thus obtained. It is difficult to reconcile the conduct of Mrs. Olmstead towards her husband on that occasion, with the ardent affection which she had expressed to him in all her letters during the previous summer and fall, or with the statements she made long afterwards, that she had not even then lost her affection for him, and still hoped to live with him at some future period. Her separation from him must have been caused by the exertion of some most unfavorable influence over her. What that influence was, is too plain for doubt. Mrs. Randell had declared, as soon as she entered the house the previous November, when she and her daughter returned from their prolonged visit to the country, that she meant her daughter should leave her husband as soon as the matter could be ar-

The People v. Olmstead.

ranged.    The spirit that actuated Mrs. Randell at the time of the separation, may be gathered from her subsequent statement that she wished the policeman, when he came in, had broken Mr. Olmstead's head.

It is not material to inquire how much the account given by Mrs. Porter, of the visit of McKeon on the evening after the separation, and of the language then used by Mrs. Randell, is shaken by the attempted contradiction of her by McKeon, and by the servant girl Eliza; for the entire rejection of that whole transaction, would not in any manner affect my view of the case.   At the same time I am bound to say, that a careful study of the testimony as reduced to writing, has but confirmed the impression which its delivery made upon my mind; and that, in all its essential features, I deem Mrs. Porter's account of the language of Mrs. Randell substantially correct. I cannot believe that the statements which she says Mrs. Randell then made could have been fabricated; least of all by such a witness as Mrs. Porter proved on her long and very close cross-examination.   She had often before heard Mrs. Randell speak of Mr. McKeon as the young man with whose marriage to her daughter she should have been so much pleased. And she could not fail to notice and remember when McKeon was pointed out to her, such expressions on the part of Mrs. Randell, as that he ought to have been Maria's husband, and the child should have been his child.   These declarations were indeed remarkable, but not very much more so than some other things in the case, as to the truth of which no question whatever is made.   The child thus separated from its father was, not long after, baptized.   Of its baptism the father knew nothing.   Mrs. Randell had previously declared he should not know of it.   The name given him in baptism differs materially from that by which he had been called by his parents before their separation.   Mrs. Randell stated, before the baptism, that she would not consent that he should bear any part of his father's name.

It is needless to dwell longer upon these unhappy differences.

Nor is the foregoing recital any thing like a full history of the case. The mass of testimony before me is so great, that it was possible only to touch upon the more prominent 'points. But enough has been said to show the true character of this controversy. The whole matter may be shortly summed up. I find nothing proved here which shows Mr. Olmstead to be in fault during these long and painful occurrences. It is not shown, it is not even pretended, (though there was no want of will or of diligence on the part of the respondents in investigating his past history,) that he has ever lived otherwise than in entire harmony with all around him. Mrs. Randell has had serious, and sometimes very angry differences with many of her nearest, and those who should be her warmest friends. How she, a widowed mother, on some occasions treated her only child, has been adverted to. Her own witness, Mr. Suydam, the nearest kinsman of Mrs. Olmstead, testified that he and his family had been so treated by both these ladies, that intercourse with them had been suspended, and they could not be invited to his son's wedding. Mr. and Mrs. Scott, who had known them, as acquaintances merely, for some years, spent a few weeks in the same hotel with them at Ballston, in the summer of 1855. The result was an angry correspondence, and a suit by Mrs. Randell against Mr. Scott for a libel alleged to have been contained in one of these letters. This correspondence, too, arose out of what seems to have been a desire on the part of Mr. Scott to caution Mrs. Randell against injuring the hotel-keeper, whose guests they all were, by reports she was spreading. With both the ladies connected with the boarding house where the separation took place, Mrs. Randell is shown to have been at enmity. Not long after leaving that house, she called on the witness, Mrs. Murray, with whom Mr. Olmstead was then at board. Without disclosing her own identity, if she did not seek to conceal it for a considerable time, she had a long conversation with that lady. The result was that misapprehensions were very soon found to exist. Misrepresentations were alleged to have been made,

The People *v.* Olmstead.

and the calls of Mrs. Murray on Mrs. Randell ensued for the purpose of procuring explanation and correction. Other like instances might be selected from this mass of testimony, and from the letters of Mrs. Olmstead, but these will suffice. They are such as to throw light on those parts of this case, (few, if any,) which are not sufficiently elucidated by direct and positive proof of the facts. They satisfy me fully that if it be true, as both Mrs. Randell and Mrs. Olmstead said, that the former and Mrs. Olmstead could not live together, or in the same house, the fault was with her, not with him. Had she been, I will not say, as kind hearted, well disposed, patient and forbearing as he, but had she not been of a temper unusually excitable, exacting and unyielding, I feel no doubt that they might and would have lived as happily together as their common affection for the wife of the one and the daughter of the other would naturally have led them to do.

This separation has, therefore, taken place without any fault on the part of the husband. No court of equity could on this case decree a separation of his wife from him, for any cruelty, unkind treatment or neglect.

This first branch of the last inquiry being thus settled, it is the end of the case. The paramount legal right of the father to the custody and education of his child can be interfered with by a court of equity only where he has been at fault in bringing about the separation. It has never been dreamed that, when the mother has been at fault in the occurrences preceding the separation, she should be rewarded for her faults by the interposition of the court. If she breaks up the household, and departs from her husband's house, wrongfully, whether it be done of her own purpose, or from weakly yielding to the evil influences of others, she is not to be allowed to take with her the children of the union. By so doing, she would violate the clear rights of the husband, and would inflict a wrong on the children, by depriving them of the care of that protector to whom the law· has wisely committed them as their best friend ; and above all, she would be turning those

parental affections, which were designed to be a bond of union to the family, into the means and reward of its disruption— into the punishment of the innocent, and the solace of the guilty.

And here I might properly stop, did not the positions so zealously contended for by the counsel for the respondents demand a brief notice. These positions are, it must by admitted, to a certain extent countenanced by some *dicta* in the cases; but they are, I think, all explainable by the doubt, whether the remedy by *habeas corpus* is the proper one, or by the fact that those cases came within one of the exceptions to the father's paramount right, as above stated. It was very earnestly contended here, that the true test is, not what are the rights of either parent, but what does the ultimate good of the child demand. Suppose for the moment that this is the true rule, and the whole of it, (though I cannot admit it to be so, unless the law regards the rights of the father and the real interests of the child as identical,) then the court is to judge of the true and paramount welfare of this child for him, in his stead, and as he would do, if the proper means, in respect of knowledge and the faculty of judging correctly, were temporarily conferred upon him. But even upon such a basis, I must surely remove him from his present custody, and commit him to the father. Else a wayward disposition, an ungoverned temper, and an inordinate regard for his own gratification, may lead him to make his life a burden to himself and to all who are connected with him. If Mrs. Olmstead, in mature life, warmly attached to her husband, and apparently sincerely desirous of living with him, has been unable to resist the influence of Mrs. Randell, how shall this helpless child resist the mouldings of such a will and such passions?

To give this child to its father, does not imply that it must be deprived of all a mother's fondness and attentions. The husband was always willing to receive and to cherish both his wife and child. There is no reason apparent to the court why he should not yet do so. Certainly no such reason appears in

The People *v.* Olmstead.

the character or conduct of the husband and father. The only obstacle in the way is the yielding of the wife to a noxious influence from abroad, which has caused her to forget her vows and her duty.

It has been well said that a Christian wife and mother should hesitate long, and suffer much, before placing herself and her companion in the doubtful and dangerous condition of a wife without a husband, and a husband without a wife. If much ill treatment and unkindness on the part of the husband should be borne by the wife, before the family is broken up, surely there should be the greatest caution and hesitation before a husband and wife are parted by the influence of others, when they would live happily together if left to themselves and the promptings of their own affections.

It is a painful duty to speak, as I am compelled to speak, of the party whose acts have brought before the court this unseemly controversy. But justice demands it; justice not merely to this particular family, which has been unnecessarily, though I hope but temporarily sundered, but also to all families and to society at large.

The family is the origin of all society and of all government. The happy family, well organized, and successfully discharging its functions, by strengthening the parents for the proper discharge of life's duties, while it fits the children to succeed to those duties, is the highest type of human goodness, and the surest source of human happiness. The whole frame of government and laws has been said to exist only to protect and support the *family*, so that it may develop and perfect the character of its members. Such an institution is to be cherished and guarded. The dearest interests of the whole community require that it should be made, as far as possible, inviolable. The hand that has been raised against its sanctity must be stricken down. Every inducement to attack it from without, or to sever it within, must be removed. Our laws have made the marital relation indissoluble, except for infidelity to the highest obligation which that relation imposes; and to

the offender against that duty is denied the opportunity of renewing the relation. The reason of this rule is that it will tend to the sanctity of the family. What cannot be dissolved is much more likely to be borne willingly, and at last cheerfully.. But if a relative of either party may stir up strife between them, and separate them, as has been done in the case now before me, public policy requires that the party sinned against shall not bear all the punishment; that the offenders shall not escape animadversion; that the affection which they may have formed towards the natural and proper objects of love, shall not be permitted to keep the parents asunder, but shall rather be made use of to bring together again those whom both religion and law have united, and who cannot be separated but at the expense of every interest of society.

An order must accordingly be entered, adjudging that the relator is entitled to the care of his infant child, and directing that the said child be delivered to him, and the care and custody of said child be committed to him.

[Kings Special Term, November 30, 1857. *Birdseye*, Justice.]