Dec. 1839.

In the matter of Doyle.

---

## In the matter of DOYLE.

The father of an illegitimate child has no right to its care and custody as against the rights of the mother; and this court has no power to take such child from the care of the mother, and give it to the father.

THE petitioner in this case sets forth that he is the father of an illegitimate female infant child, by Bridget Welsh, born in April, 1833, which child has been principally in the custody of its mother, but for the most part supported by the father—that the child is of an age to require education, and care and attention to its morals and habits—that the mother is an improper person to have the care of the education of the child, and is of dissolute habits, and refuses to

give the custody of the child to the father. The pe-
titioner further states that he is a householder, living
with his wife and family, and is desirous of having
the care and custody of this illegitimate child, to be
brought up in his family ; and prays that the custody
of the child may be given to the petitioner, and that
the mother may be restrained from interfering with it.

There are, on the other side, numerous affidavits,
shewing the good character of the mother, and her
proper management of the child, and the improper
character of the father; the reading of which was,
however, objected to.

*P. G. Buchan,* for petitioner.

*W. S. Bishop,* for the mother.

THE VICE CHANCELLOR. There seems to be no
doubt, both under the English law and our own law,
but the father of an infant child, being under a legal
obligation to support such child, is entitled to its care
and custody, and to direct the disposition of it, unless
there are some circumstances in his conduct which
will justify a court in depriving him of this right, and
consigning the child to the care of some other per-
son. These principles relate, however, to legitimate
children, and to the separation of the wedded father
and mother for some impropriety in the father. For
that unfortunate class, the innocent offspring of illi-
cit intercourse, the laws seem to have made no posi-
tive provision as to their care and custody. It is
true, our statute has provided for the indemnity of
community, by requiring the putative father to give
security for the support of an illegitimate child. But
neither the statute nor the decided cases have em-

braced the important object of the custody of the child. It would seem as if power should be vested somewhere, to save, if it were possible to save, the innocent offspring of guilt from the ruinous consequences of a demoralizing education, by giving the custody to the father or the mother, as the welfare of the child should seem to require. But after much searching, I regret to say that I can find no such authority vested in any tribunal or officer ; and, without a landmark, I am sent back to the principles of the common law for my guidance in this case. The first principle that meets me is, that an illegitimate child has, in contemplation of law, no father. Such child is *nullius filius,* and there is, therefore, no father who is bound to support it, or can rightfully claim its care and custody. There are, it is true, certain statute regulations by which the putative father may be compelled to indemnify community against the expense of supporting a child who may otherwise become a public charge. But these statutes only make the person charged, a father for a particular purpose, viz. for the indemnity of society against the expense of the support of the child. The paternal and filial relation, in all its endearing and legal consequences, does not exist between such a father and such a child. The law looks coldly upon this relation, and takes no further care of it than to see that the community is not put to expense. In such cases, there seems to be more than a legal doubt who is actually the father—the sworn father being termed merely the *putative* father, while there can be no doubt who is the mother. The identity of the mother is beyond all mistake ; and as she is the only parent such a child can have with any legal certainty, she is the

parent to whom the custody of such a child seems properly to belong. Such is the inevitable result of the common law doctrines in regard to this relation. Chancellor Kent, in his Commentaries, seems to have come to the same conclusion. He says, 2 Vol. p. 178: " She," the mother, " has a right to the custody and control of such child as against the putative father, and is bound to maintain it as its natural guardian ; though perhaps the putative father might assert a right to the custody of the child, as against a stranger ;" and he cites Strange, 1162.

This view of the matter would lead to the result that the prayer of the petitioner should be denied ; but if this court could be persuaded that it had the power to give the custody of the child in such case to the father, it would ascertain, either by its own inspection or by a reference to a Master, whether it were proper so to do. Contemplating that some such examination might possibly be necessary, I have been myself to see the child in the absence of and without the knowledge of her mother. I find she is very well educated ; that due care has been paid to her morals, her manners, and her education ; that she loves her mother, and prefers to live with her ; that she is daily sent to school ; and that few girls of her age are better taught, either in mind or heart.

In this case, therefore, if the court had the power, I should think it, so far as I can judge from personal examination, a very unwise exercise of it, to take this young girl from the custody of her mother, and give her over to the care of her father.

The prayer of the petition must therefore be denied with costs.