In the matter of the application of ALFRED C. BAKER for writ of *habeas corpus*

*v.*

HELEN L. BAKER.

[Submitted January 9th, 1913.   Decided January 15th, 1913.]

Where parents live separately, either parent has the right, in a proper case, to see a legitimate child in the custody of the other parent, and the same right exists in case of a bastard child living with its mother, when the father contributes to its support, in absence of a showing by the mother that such right is detrimental to the child's best interests; the question of access being considered from the viewpoint of the child's best interests.

On petition for custody of children, &c.

*Mr. J. Harry Hull,* for the petitioner.

*Mr. Walter L. McDermott, contra.*

HOWELL, V. C.

The parties to this controversy are husband and wife; they are now living separate from each other; they have two children, one about six years of age, which was born out of wedlock, and is therefore illegitimate, and the other about three years of age, whose legitimacy is not questioned. The father now petitions the court first for the custody of the children, and second, in case the custody shall be denied, for reasonable access to them.

The case was heard on petition and answer thereto and a repli-
cation.   The answer alleges as one reason why the father ought
not to have custody of or access to the children to be that he
is not a fit person to exercise those privileges.   Before going into
the question of fact the parties submitted a question of law, viz.,
whether the father had a legal right to reasonable access to his
bastard child who is now in the custody of the mother, in the
hope that a decision of the question of law might obviate any
further inquiry into the facts.   On the argument counsel for
the father declined to press the claim for the custody of the
children. This leaves only the question of reasonable access.

   In the case of legitimate children there is no question about
the right of access.   Where the parents are living separately
either has a right to see any child which is in the custody of the
other, and if the parties cannot agree the court will make such
order in the premises as seems best under all the circumstances;
but the books are singularly void of precedents relating to access
to illegitimate children, and while this question appears never
to have arisen, I see no reason in the nature of things why this
court should in a proper case be debarred of a right to give
access to illegitimate children as well as to legitimate ones.   It
is said that chancery is the *parens patriæ* and as such admin-
isters its jurisdiction for the benefit of infants.   Why this juris-
diction should be confined to legitimates is not apparent.   *Ros-
sell* v. *Rossell, 64 N. J. Eq. (19 Dick.) 21.*   While the relations
between the parents of illegitimates and the rights of inheritance
and custody and the duty of maintenance are different from the
same rights and duties as appertaining to legitimate children,
the state has the same interest in the one as in the other, and it
may well be that the right of this court to interfere would be a
stronger right in case of illegitimate children of parties living
separate than in the case of legitimate children known and
acknowledged to be such, who might be expected possibly to
have greater care than might be exercised in the case of the
illegitimate.   The question is not one of custody; it is widely
separated therefrom.   It may be that in this case the mother
would have a superior right to the custody of her illegitimate
child, although even that is doubted.   *Hesselman* v. *Haas, 71 N.*

*J. Eq. (1 Buch.) 689; Schoul. Dom. Rel.* § *278,* and cases cited hereinafter.

It was stated on the argument that the father in this case was making a monthly contribution to the maintenance of the children. Why has he not a right to see the children and determine for himself whether the stipend is being properly administered? Why has he not an interest to satisfy himself by inspection that the illegitimate child is being properly clothed and nourished and that it has a proper home to live in, that care is being taken of its training, its education and its moral bringing up?

The statutes of this state relative to the custody, care and maintenance of children are supposed to relate solely to children born in lawful wedlock. Why the principles thus legislated upon do not apply with equal force to illegitimates I am not able to perceive.

The question is one of new impression and must be decided upon principle and not upon authority, yet the cases relating to the custody of illegitimates may throw some light upon the obligations which ought to be imposed upon the parties to a controversy like the present one. In the case of *Queen* v. *Nash, 10 Q. B. D. 454; 52 L. J. Q. B. 442,* Sir George Jessell said that the question of custody of an illegitimate did not depend upon the mere legal rights upon *habeas corpus,* but upon equitable doctrines, and that regard was always had to the mother, the putative father and the relations on the mother's side, that in such case there was that sort of blood relationship which, although not legal, gives the natural relations a right to the custody of the child. In the same case Lord Lindley said the question was not whether the mother is the legal guardian of the child, but whether as between her and strangers the court ought not to have regard to the natural relationship of the mother; and Lord-Justice Bowen said: "It is said that the mother has no legal right, but that is not the question; the question is whether in considering what is for the benefit of the child the court will have regard to the natural relations. As a general rule the mother is the proper person to have the custody of a child. In this case when we consider what is for the benefit of the child the scale is turned by the respectability of

the persons with whom she is to be placed." The doctrine of this case was affirmed in the house of lords in the case of *Barnardo* v. *McHugh (1891), A. C. 388; 61 L. J. Q. B. 721.* Halsbury, L. C., said: "I doubt very much whether any absolute rule can be laid down, but in *Queen* v. *Nash, supra,* this very question came for decision before the court of appeal, and Sir George Jessell appears to have pointed out the distinction between strict legal rights as to guardianship and the jurisdiction which a court of equity does and always did exercise in regard to such orders as are now in question. Sir George Jessell pointed out that the court is now governed by equitable rules, and that in equity regard was always had to the mother, the putative father and the relations on the mother's side. Natural relationship was thus looked to with a view to the benefit of the child. There is in such a case, he says, a sort of blood relationship which, though not legal, gives the natural relations a right to the custody of the child. His lordship, I think, did not mean an absolute right, but such a right as he had already described to be considered by a court of equity in making such orders." The opinions of Lord Herschell and Lord Hannen were to the same effect.

This is the latest expression of the court of last resort in England, and it is entitled to our best consideration. If no general rule can be laid down respecting the custody of an illegitimate child, but if on the other hand the child's own best interests are always to be consulted, why should not the same equitable doctrine be applied to the question of access?

To find out what is the best thing for the infant must be the object of the present inquiry. Animosities between the parents cannot control, because it may well be that they would be detrimental to the best interests of the infant. I think it is much better for the child to have the father visit it at stated times, not only to learn of its continued welfare, but to infuse into it at an early age the natural love and affection that it should have for a parent who is interested in its well being. In his later years he will be able more lightly to bear the ignominy of his origin if he has the consciousness that he is acknowledged to

be on the same affectionate footing as the other child, notwithstanding the disparity between their legal situations.

The question, therefore, resolves itself into this: What is the best thing for the child? The reasons which I have herein set out on that subject seem to me to be controlling. The question of access like the question of custody is one that must be considered from the viewpoint of the child's best interests, and it is my opinion, therefore, in this case, that unless the mother can prove that the visits of the father to the child will be detrimental to the child's best interests, or if the personal objection to the father shall be waived, an order should be made giving the father reasonable access to both children.