THE PEOPLE OF THE STATE OF NEW YORK ex rel. FILUMINA MAHOFF,
Relator, *v.* NICHOLAS MATSOUI, Respondent.

Supreme Court, New York County, January 2, 1931.

*Mayer & Weisinger* [*Samuel B. Weisinger* of counsel], for the relator.

*Joseph F. Finkelstein,* for the respondent.

UNTERMYER, J.    This writ of habeas corpus was to secure to the relator the custody of her infant daughter, Nina, five years of age, now living with her father, the respondent.    The parties met in Russia in 1919 and lived together in Russia, Turkey and the United States until 1929 without interruption, representing themselves to be husband and wife.    It is conceded, however, that no ceremonial marriage ever occurred.    The respondent relies upon an alleged common-law marriage to support his claim to the custody of the child.    He contends that the relator is his wife, that she has renounced her duty and forsaken his home and that he is entitled to the custody of their child to the exclusion of the relator.    The

relator asserts that there was no common-law marriage and that she undertook to live with the respondent upon his promise of future marriage, which has never been fulfilled. She contends that their relations were meretricious and that the child, whose custody is the subject of this proceeding, was born out of wedlock. She argues that if these are the facts she has a right of custody superior to that of its alleged putative father. After leaving the respondent with her child, in the fall of 1929, the relator married a man whose name is Mahoff. It is evident that Mahoff was unable adequately to support the relator and her child, as her letter written to a friend testifies. Early in 1930 the relator returned with her child to the home of the respondent, where she left the child until she had procured a position at a summer camp. Apparently, then or soon thereafter, her demand for the return of the child having been refused, she instituted this proceeding. It should also be stated that the relator expressly renounces all claims against the respondent for the support of the child.

The question whether these parties have contracted a common-law marriage in Russia or the United States is fraught with such uncertainty, and the consequences to persons who are not parties to this proceeding (including this child and the relator's second husband) are so serious, that the question is one which should not be decided unless its decision is unavoidable. The parties here seem to assume that if they were not married the relator would be entitled to exclusive custody of her child because then it was born out of wedlock and that if they were married the respondent would be entitled to exclusive custody. I do not concur in either view. I do not recognize any property rights of the parents, except as they are consistent with the interest of the child. This child is not a chattel belonging to either party if they are not married; the parents are not tenants in common if they are. This does not mean that the relations of the parents to the child are not to be considered in determining the question of its custody (*Lester* v. *Lester*, 178 App. Div. 205; affd., 222 N. Y. 546), but only that the " rights " of these parents, both of whom have demonstrated their devotion to the child, are of such subordinate importance here that the question of custody may be determined without deciding the precise nature of those " rights."

The very function of the writ of habeas corpus in such cases illustrates the principle. That principle was well stated in *People ex rel. Davenport* v. *Kling* (6 Barb. 366): " This writ is, by eminence, *the writ of liberty.* Its office is, to inquire into the ground upon which any person is restrained of his liberty, and, when it is found that the restraint is illegal, to deliver him from such illegal restraint.

Ordinarily, this end is attained by allowing the party improperly detained the free use of his volition. But in the case of a child, too young to be capable of a determining for itself, the court or officer assumes to determine for it. In making such election for the child, its welfare is chiefly, if not exclusively, to be had in view. The rights of parental authority are to be regarded no farther than they are consistent with the best good of the child. The tribunal before which it is brought, is to do what it may suppose the child, in the exercise of a proper judgment, and looking to its own benefit, would do." (See, also, *Matter of Wollstonecraft*, 4 Johns. Ch. 80, 82; *People ex rel. Barry* v. *Mercein*, 8 Paige Ch. 47, 55; Church Habeas Corpus [2d ed.], § 446.) The action to be taken should thus be such as the child, if mature, would take. It has accordingly become the settled doctrine that in such cases the court exercises pre-eminently a discretion in the interest of the child to determine what care and custody are best for one not entitled to be free of all restraint. (*New York Foundling Hospital* v. *Gatti*, 203 U. S. 429, 439.) Expediency and equity, and above all the welfare of the child, are the dominant considerations rather than the legal rights of others to its custody. (*People ex rel. Riesner* v. *N. Y. N. & C. Hospital*, 230 N. Y. 119; *Matter of Lee*, 220 id. 532; *People ex rel. Pruyne* v. *Walts*, 122 id. 238.) When the proceeding to determine custody is instituted by petition the position of the parties and the function of the court have been thus described: " The chancellor in exercising his jurisdiction upon petition does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against any one. * * * He is not adjudicating a controversy between adversary parties, to compose their private differences. He is not determining rights ' as between a parent and a child ' or as between one parent and another." (*Finlay* v. *Finlay*, 240 N. Y. 429.) I shall, therefore, refrain from any adjudication of the status of the parties which must necessarily either bastardize the child or impute bigamy to its mother, unless the determination of the question of custody imperatively requires it.

I am of the opinion that this is not required. If the parties are married there can be no question that by section 70 of the Domestic Relations Law (as amd. by Laws of 1923, chap. 235) the welfare of the child and not the superior right of either parent is the supreme consideration. By that amendment it was provided that " there shall be no *prima facie* right to the custody of the child in either parent, but the court shall determine solely-what is for the best interest of the child, and what will best promote its welfare and happiness." Section 70 of the Domestic Relations Law (as amd.

by Laws of 1923, chap. 235), it is true, probably has relation only to children born in wedlock, but I perceive no reason why, if the parents are not married, the guiding principle should not be the same. The needs of the child are surely the same no matter what the relations of the parents may be. Although early cases in this State have held that as between parents of an illegitimate child the mother has a superior right of custody (*Robalina* v. *Armstrong*, 15 Barb. 247; *Matter of Doyle*, 1 Clarke Ch. 154), the welfare of the child has always been recognized as the paramount consideration. The solicitude with which the law protects the welfare of legitimate children and to which it subordinates the claims of either parent (Dom. Rel. Law, § 70) should not be relaxed when the status of the child is in dispute. Thus, in several cases, the putative father or a member of his family has been favored even to the exclusion of the mother. (*People ex rel. Davenport* v. *Kling, supra; Poss* v. *Clark*, 158 Ga. 602.) Although the right of the mother of an illegitimate child to custody and control of its property is recognized (*Baylis* v. *Baylis*, 207 N. Y. 446; *Grillo* v. *Sherman-Stalter Co.*, 195 App. Div. 362; affd., 231 N. Y. 621), this does not afford an absolute right to custody of its person. (*Matter of Lee; supra.*) Instances are common where the court has interfered even with the control of a parent (*Matter of Wainman* v. *Richardson*, 119 Misc. 363; *People ex rel. Humex* v. *Phelps*, 58 id. 625; *The Queen* v. *Gyngall*, [1893] 2 Q. B. 232) or a general guardian (*Matter of Lee, supra*) and custody of the child has been awarded to another.

I shall, therefore, not decide the question of custody upon the rights asserted by either of the contending parties here, but will determine it upon principles which the parties, in the heat of controversy, seem to have ignored — the welfare of the child. In this connection it is proper to observe that although each party has assailed the other as unfit to be intrusted with the custody of the child, either one, in my opinion, would be a proper custodian. Both parties are so situated that they are under the necessity of working for their living. The father, it is true, is probably in a position to offer the child more adequate support, but although this is an important, it is not a controlling, consideration. (*Lester* v. *Lester, supra; People ex rel. Beaudoin* v. *Beaudoin*, 126 App. Div. 505.) On the other hand, the father is a painter by occupation and, therefore, absent from home during the greater part of each working day. There is, moreover, reason to suspect that the child's nurse who was present at the hearing may have been engaged in anticipation of these proceedings or, in any event, that her services may not be continued. The propriety, moreover, of awarding to the mother the principal custody of a child of this age and sex

(*Taylor* v. *Taylor*, 163 Ark. 229) is obvious. So fundamental are such ties that nothing short of circumstances most unusual and not apparent here would lead me to impair them by denying altogether to the child its mother's companionship and care. I would decline to do this though the parties here are married and the relator, therefore, guilty of the misconduct charged. The propriety of such an award was indicated in *Ullman* v. *Ullman* (151 App. Div. 419) where the court said: " The mother may have been in fault and the father blameless, and yet the age or condition of the child may require a mother's care. Both parties give evidence of the undesirability of a divided control. And yet I am not satisfied that there is not some necessity for it, for it is questionable whether it is not for the child's interests that it should have ordinary maternal love and nurture. The child at tender age is entitled to have such care, love and discipline as only a good and devoted mother can usually give. This should continue from intimate association until the infancy grows into something like boyhood, and while perhaps the exact limit cannot be stated, yet it will be when the infantile state has been passed. Meanwhile the father must not be excluded from a full opportunity to have such possession of his child as will enable him to impart to it what from the father enters into the child's character, and to indulge the affection that a father feels and bestows, whereby the boy may grow up in knowledge and love of him." The same is true concerning the importance of preserving here the affection which manifestly exists between the respondent and the child, even if the respondent is only its putative father. In a similar case it was said: " The law should never receive such a construction as would tend to dry up the sources of natural affection. Nor should the child, who is innocent of the guilt of its parents, be denied all claims to the protection and love of its father. Neither should the father be denied the privilege of assuming voluntarily the duties and responsibilities which, in the courts of other States, are forced by law upon the putative father of his illegitimate child." (*Barela* v. *Roberts*, 34 Tex. 554, 558.)

In thus dividing the custody of the child it may, it is true, be subjected to some privations, for the mother must depend on her own labor for support. But the conditions are also not perfect in the respondent's home and no matter with which parent it resides it will probably not be exempt from the hazards of life. It may be also that the relator will be able to adjust her work, as she appears to have done heretofore, so as to give a maximum of attention to the child. This the respondent could hardly do. All the circumstances considered, I have, therefore, concluded to divide the

custody of the child between its mother and father so that each may share in the expense of its support, in the development of its character and that, whatever the relations of its parents may be, the child may benefit from the devotion of both. In doing this I believe that any privation resulting from its residence with the relator will be more than offset by compensating benefits.

I will accordingly award the custody of the child from Monday morning at eight o'clock to Friday afternoon at five o'clock of each week to the relator. I will award the custody of the child to the respondent from five o'clock on Friday of each week to eight o'clock on Monday, those being the hours during which, it is fair to assume, he will not be at work and will be able to associate with the child.

The order to be entered herein should provide that neither party may remove the child from this jurisdiction without the order of the court. (*Rone* v. *Rone*, 20 S. W. [2d] 545; *State ex rel. Shoemaker* v. *Hall*, 257 S. W. 1047.) The provisions herein concerning custody are to continue in effect until such time as a change of conditions in the life or requirements of the infant may arise, when either party may apply to the court to determine anew the future custody of the child. (*Simon* v. *Simon*, 6 App. Div. 469; *People ex rel. Parker* v. *Parker*, 155 id. 928; *People ex rel. Sinclair* v. *Sinclair*, 91 id. 322.) Settle order.