Johnston, J.
This is a habeas corpus proceeding, instituted by the respondent to secure the custody of his daughter, Gwendolyn, three years of age. Appellants are the mother (hereinafter called Ruth) and the maternal grandmother. Respondent in his petition alleges that he is the husband of Ruth and the infant is the issue of the marriage. Ruth in her return denies she is the wife of respondent and that he is the father of the child and, for an affirmative defense, alleges that respondent is “ mentally, physically and financially unable to care for, educate and protect the infant ”, while she is able, competent, and willing to do so. The maternal grandmother’s return is substantially to the same effect. Therefore, two issues — paternity and custody — were tendered by the pleadings for determination by the court, and the proof was directed to both issues.
The learned court, after a protracted hearing, found that respondent is the father of the infant and awarded custody to him, with the right of visitation to Ruth at all reasonable times and places, and granted “ custody ” to Ruth from July 1st to August 15th of each year. The order also directs respondent, at Ms expense, to deliver the infant to Ruth in Brooklyn on or before July 1st and the latter to return the infant to respondent on August 15th. The finding that respondent is the father is clearly sustained by the evidence, as are the two findings, implicit in the order, that respondent is, and Ruth is not, a fit and proper person to have custody.
The child, born on February 10, 1944, is illegitimate as to both parents, even though a ceremonial marriage between Ruth and respondent occurred on March 26, 1944. Admittedly, that marriage is void because, at the time it was contracted, Ruth was married to one Gildersleeve, who was still living and from whom she had not been divorced. Hence, under section 24 of the Domestic Relations Law, the child did not become legitimate by the subsequent marriage of. her parents, because that statute contemplates a valid marriage. (Olmsted v. Olmsted, 190 N. Y. 458, affd. 216 U. S. 386; Matter of Moncrief, 235 N. Y. 390.) There is testimony from which it may be found that respondent contracted the marriage without knowledge of Ruth’s prior marriage to Gildersleeve on April 14, 1939, or to one Bales on July 12, 1943. But, assuming that to be true, even in an action for annulment the child could not be declared legitimate as to respondent (Civ. Prae. Act, § 1135, subd. 6) because she was born prior to his marrriage to Ruth and, therefore, the infant was not a child “ of the marriage ” within the meaning of the statute.
*82 The rule is that the mother has the right to the custody of an illegitimate child as against the father, though the father has the right to the custody as against a stranger. (2 Kent’s Comm. [14th ed.], 317; Matter of Doyle, 1 Clarke Ch. 154; People ex rel. Trainer v. Cooper, 8 How. Pr. 288, 293.) The very statement of the rule shows that, under certain circumstances, the father has a right to the custody of his illegitimate child. Where, as in the case at bar, it appears that the mother is not a proper and suitable person the court, in behalf of the child, will interfere with the mother’s custody of an illegitimate child and direct that it be placed elsewhere. (Robalina v. Armstrong, 15 Barb. 247; People v. Landt, 2 Johns. 375.) The proper statement.of the rule is that .the mother of an illegiti- • mate child is prima facie entitled to its custody and, when she is a proper and suitable person, the court will award its custody to her as against the father or anyone else. (10 Carmody on New York Pleading and Practice, § 45, and cases cited.)
When the question of the custody of children is brought before the court by habeas corpus, it is the duty of the court to look solely to their welfare and decide accordingly. (Matter of Lee, 220 N. Y. 532, 538.) To paraphrase the language of Judge Cardozo in Finlay v. Finlay (240 N. Y. 429, 433-434), the court acts as parens patries to do what is best for the interest of the child and puts itself in the position of a “ wise, affectionate and careful parent ”; the court does not determine “ rights ” as between a parent and a child or as between one parent and another.; the court interferes for the protection of infants, qua infants, by virtue of the prerogative which belongs to the State as parens patries. True, the ease last cited involved the custody of legitimate children, but what was said applies with equal force to illegitimate children. (People v. Kling, 6 Barb. 366.) The rule which makes the welfare of the child of predominant importance and the paramount consideration in determining who is entitled to its custody applies to illegitimate, as well as to legitimate, children. (7 Am. Jur., Bastards, § 60, and cases cited.) The same rule also obtains in England. Coleridge, Lord Chief Justice, in a case involving the custody of an illegitimate child stated “ Next, we are bound now, whatever may have been the case in times past, to consider what is on the whole for the benefit of the child ”, (Queen v. Barnardo, [1891] 1 Q. B. 194, 200.)
In accordance with the above rule and in the exercise of discretion, custody of an illegitimate child was granted to the father to the exclusion of the mother in People ex rel. Lewisohn v. Spear *83 (174 Misc. 178); Poss v. Clark (158 Ga. 602); Garrett v. Mahaley (199 Ala. 606), and Ousset v. Euvrard (52 A. 1110 [N. J.]). In People v. Kling (supra) custody was granted to the paternal grandfather over the objection of the mother. In England also, custody by the father of his illegitimate child has not been disturbed, even on the application of the mother. (Rex v. Moseley, 5 East 223; In re Lloyd, 3 Man. & G. 547.) In People ex rel. Mahoff v. Matsoui (139 Misc. 21). while under the facts there involved it was not necessary to determine whether the child was legitimate or illegitimate, the court emphasized that in either case the test is what is for the best interests of the child, and held that custody divided equally between the father and mother met that test. In People v. Starbuck (42 N. Y. S. 2d 820) the right of a father to the custody of his illegitimate children was recognized, although in the exercise of discretion, custody was denied to him solely because he was seventy-five years "of age and his earnings were inadequate to care for his children and himself.
As previously indicated, implicit in the determination of the " learned court is a finding that the mother is not a proper and suitable person to have the custody of this three-year-old girl. A contrary finding would be against the overwhelming weight of the credible evidence. Indeed, appellants do not urge before this court that the mother is, or that the father is not, a proper and suitable person to have custody. Their sole contention is that respondent was not proved to be the father with the degree of certainty required by law.
On April 14, 1939, when sixteen years of age, Euth married one G-ildersleeve. A girl, Theresa (not the child whose custody is here involved), was born of that union. In August, 1942, when Theresa was eighteen months old, Euth left her husband and the baby, and she has not seen Theresa since. Accepting as true her statement that she was justified in deserting her husband, she offered no explanation for abandoning her baby. In July, 1943, when Euth was three months pregnant with the child involved in this proceeding, she met one Francis Bales, and on July 12,1943, while her marriage to Grildersleeve was still in full force and effect, she married Bales. Although she admitted that she continued to see Bales thereafter and that he paid the hospital expenses for her confinement, she denied she ever had intercourse with him and insisted she married him only ‘ to give mv baby a name ”. Although she denied Bales is the father of the child, it was she who had him so designated in the certificate of *84 birth. She insisted that one Jack Hayes (with whom she never went through a marriage ceremony) is the father. The child was born on February 10, 1944, and on March 26, 1944, while the marriage to Gildersleeve was still in full force and effect, Euth married the respondent. Bespondent has been found to be the father by reason of relations had with Euth in May and June, 1943, at the Hotel Sharon. Bespondent testified they occupied a room at that hotel at that time and he is corroborated by the hotel clerk, As heretofore stated, the finding that respondent is the father is amply sustained by the evidence. On October 24, 1944, Euth was arrested; on December 1,1944, she was indicted for bigamy; and on December 6, 1944, she was' sentenced to the penitentiary on her plea of guilty. She spent seven months and twenty days in the House of Detention and, at the time of the hearing, was on parole.
During the thirty-four months that elapsed between the birth of the child in February, 1944, and the hearing in December, 1946, Euth had the child only about seven months. From February to April, 1944, the child was with Euth and respondent. From April to August, 1944 — with Buth’s consent, but without respondent’s knowledge — the child was with Jack Hayes’ parents in Baltimore. From August, 1944, to September, 1945, with Buth’s consent, the child was with respondent’s parents in Florida. From September, 1945, to January, 1946, the child was with Euth and respondent in Brooklyn. • From January to September, 1946, with Buth’s consent, the child was with respondent’s parents in Florida. From September to November, 1946, the child was with Euth and her mother in Brooklyn. On November 21, 1946 (two days prior to the issuance'of the writ), Euth, without respondent’s knowledge, permitted a man named Brown, twenty-four years of age, to take the child to Galveston, Texas, where she remained until December 9, 1946, to which date the court adjourned the hearing so she could be present. Euth and Brown testified that they intend to marry as soon as Gildersleeve divorces her. Euth admitted that, after they marry, they intend to reside in Texas and take the child with them.
There is testimony from which it may be found that during the period Euth had the child, she stayed out until the early hours in the morning and, when she returned, she was intoxicated; and on occasions, when she was absent for several days, she was in the company of men. Since September, 1946, Euth has been living at her mother’s four-room apartment, where — to say the least the environment is not conducive to the wel *85 fare of the child. The maternal grandmother lives with a man named Finegan (not Ruth’s father), to whom she is not married, although he is the father of her three children, who also reside in the same apartment. Incidentally, the records of the court show that on January 10, 1947 — approximately three weeks after the entry of the order appealed from — an interlocutory decree of divorce was entered in favor of Gildersleeve. The decree grants Gildersleeve sole custody of Theresa, the issue of that marriage. That Ruth testified falsely concerning many material matters is apparent and the learned court so indicated; that she committed perjury when applying for a license to marry respondent is equally patent. Whether Ruth’s misconduct is the result of mental weakness or inherent wickedness, obviously she is not a proper and suitable person to have custody of the infant.
The next question is: Bearing in mind that the primary consideration is the welfare of the infant, was the court, in the exercise of its equitable functions, justified in awarding custody to respondent. While at the hearing appellants attacked respondent’s character and impugned his good faith, they neither argue nor intimate in this court that he is not a fit and proper person to have custody. Without attempting to condone his •intimacy with Ruth in May and June, 1943, when the child was conceived, and when he was thirty-three and she was only twenty-one years of age, respondent has tried to atone for the error. At that time he was in the Navy. He left with his ship the latter part of June and did not return until the following December, when he first learned of Ruth’s pregnancy. Not knowing of her prior marriages, he at once offered to marry her, but she refused. She admitted that respondent continually asked her to marry him, but testified she finally consented only because he threatened to have her prosecuted for bigamy. The court characterized the latter statement as “ ridiculous ”, as do I. Immediately upon birth of the child, respondent arranged for a monthly government allotment of $100 for Ruth and the child, and she collected it until he was discharged from the service in 1945. He also secured a life insurance policy in which the child is named as beneficiary. When Ruth was arrested on the bigamy charge, he employed an attorney to defend her and paid the retainer. He promptly and vigorously prosecuted this proceeding to secure possession of the infant. Surely, the child will fare better with her father than with her mother, who abandoned one child and, at the age of twenty-four, admittedly has had one para *86 mour as well as three husbands, and is about to acquire a fourth. ■Respondent resides with his parents, who are fifty-eight years of age, in a seven-room house in Panama City, Florida. His father earns $60 a week as a ship’s carpenter and respondent can earn $70' a week as a radio technician. His parents are devoted to their grandchild. When the child was six months old, respondent’s mother came to Brooklyn and' took the child and Ruth to Florida. For about two years the paternal grandparents have cared for the child. Appellants make no claim that that care was not of. the best. The paternal grandfather testified that he loved the child better than anything he ever had in his life.
True the court did make the statements quoted by my brother Carswell to the effect that if the issue of paternity were determined in favor of respondent, custody would be granted to him. But those statements were made after the hearing had continued for two days, after respondent had completed his entire case, after all the witnesses called by appellants had testified, and Ruth had completed a substantial part of her testimony. That the court had in mind that the issue of paternity was only preliminary to the issue of custody is shown by the statement: “ The test here is first who is the father of the child,” (emphasis supplied) and then whether custody should' be granted to Ruth- or respondent. On the issue of custody the court clearly indicated that the best interest of the child was its principal concern. In other words, the court’s statements were made at a time when it was apparent that the best interest of the child required an award of custody to respondent. Moreover, at the conclusion of the. hearing the court stated that “ The test here is whom shall I direct custody to go to. That is the whole case. ’ ’
It. is suggested that because the order contains a provision granting “ custody ” to Ruth from" July 1st to August 15th of each year, that constitutes an adjudication of her fitness and, if she is fit to have partial custody, she is entitled to complete custody; that if she is unfit, she should have no custody* only visitation rights. As Ruth resided in Brooklyn, and it was known to the court and the parties that respondent contemplated taking the infant to Florida, I believe the court intended merely to grant Ruth enlarged visitation rights, which in-the order are denominated as. “ custody ”. People ex rel. Halvey v. Halvey (185 Misc. 52, affd. 269 App. Div. 1019, affd. 295. N. Y. 836, affd. sub nom. New York ex rel. Halvey v. Halvey, 330 U. S. 610) is pertinent. There a Florida decree granted custody solely to *87 the mother, who resided in Florida. In a habeas corpus proceeding, the Special Term expressly directed that custody remain with the mother, but granted the father visitation rights from June 23d to September 7th of each year, during which period the child was to live with the father in Mew York. Although the mother urged that the visitation rights granted to the father were, in effect, a new grant of custody inconsistent with the sole grant of custody to her by the Florida decree, the order was affirmed by the Appellate Division, the Court of Appeals and the United States Supreme Court.
It is also suggested that sound discretion will not allow the child to go outside the State and destroy the mother’s right of visitation, without any showing in the record that she had forfeited her right thereto. I believe the record would support a finding that Ruth forfeited her right to visitation, but the court in fact granted her such right by permitting her to have “ custody ” for a period of six weeks each year.
It is further suggested that, if it be determined that Ruth is unfit, the child should be placed under the control of a society in New York, with the right of visitation in the mother. I tbiuk not. I agree with the view of a noted New Yorker that “ the most humble home presided over by loving parents is better than the best institution.” But, if the child be placed in a New York institution, Ruth will be unable to enjoy the right of visitation because it is her avowed purpose to reside in Texas with BroAvn.
An able and experienced judge, with the opportunity — denied us — of seeing and hearing the parties and their witnesses, has concluded that the physical and moral well-being of the child will best be served by granting custody to respondent. On this record that conclusion was inevitable and should not be disturbed, particularly when it is not urged that it is erroneous or even doubtful.
The order should be affirmed, without costs.