THE PEOPLE OF THE STATE OF NEW YORK ex rel. " JEAN FRANCOIS ", Respondent, v. " OLGA IVANOVA ", Appellant.*

First Department, November 14, 1961.

*de Bransbourgh & Merritt,* attorneys (*William Merritt* of counsel), for appellant.

*Samuel Sweetbaum,* attorney (*Marshall D. Sweetbaum* of counsel), for respondent.

MEMORANDUM BY THE COURT. Order, entered on April 17, 1961, to the extent it grants visitation rights to the petitioner, affirmed. The child was born out of wedlock. Petitioner is the father and respondent the mother. Subsequent to the birth of the infant the petitioner obtained a divorce decree from his wife. The parties did not marry, each party blaming the other for refusing to so do. It appears, however, that the parties and the infant lived together as a family unit for upwards of six years prior to the commencement of this proceeding. The parties and their attorneys were heard at length below. Neither party offered or requested the opportunity to present evidence. The court declared its intention to award custody to the mother and visitation rights to the father. Thereafter appellant's counsel excepted but did not request any opportunity to offer evidence. While technical omissions of such nature will not be permitted to defeat the best interests of the child, nevertheless the record

* To protect the interests of the child, this opinion is published under fictitious names.

adequately supports the determination appealed from. On this appeal the respondent-appellant contends the petitioner has no legal rights in respect of visitation because the child is illegitimate. The best interests of the infant is the guiding principle in the determination of custody and the right of visitation. (*Finlay* v. *Finlay,* 240 N. Y. 429, 433, 434; *Matter of Bock* [*Breitung*], 280 N. Y. 349, 353.) The father of an illegitimate child may be awarded custody (*People ex rel. Meredith* v. *Meredith,* 272 App. Div. 79, affd. 297 N. Y. 692); and, a fortiori, the right of visitation. Most significant, if ever we must respect the opportunity afforded the Trial Judge to evaluate the character of the persons confronting him, it is in a proceeding of this nature, where the Judge saw and held extensive conversations with the parties, and enjoyed a unique position to form an estimate of their qualities. The printed record in this proceeding is not a satisfactory substitute for such firsthand observation. No other question is presented on this record and no other point is made by the appellant. In a proceeding of this nature we are not called upon to adjudicate controversies between parents. (*Finlay* v. *Finlay, supra,* p. 434.)

BREITEL, J. (dissenting). So far as research can establish this is the first case in this State in which visitation rights have been granted to the father of an illegitimate child in the absence of unfitness, misconduct or disability in the mother, and over her objection, and but one of a handful of cases in the Anglo-American jurisdictions involving such visitation rights under any circumstances. Needless to say the problem posed is not solved, nor the devil exorcised, by incantations of partially developed syllogisms. Nor does the case raise any question of a need for additional evidence; none has made that suggestion. Indeed, the record made is very clear, and one thing it does not show is any similitude of a stable family relationship, licit or illicit. On the contrary, the record undisputedly shows a tawdry quarreling relationship between traveling entertainers over three continents. Sometimes (after the man left his wife and child) they lived with his mother, and sometimes with her parents, and sometimes in their own quarters.

Nor does this case bear any resemblance to the problem in the matrimonial dispute where the viewing and interviewing of the litigants may be crucial to solution of questions of divided custody and visitation — every child to begin with being entitled to the care and affection of both parents in a single home. Indeed, the issue is as simple and as troublesome as first stated

— and the " qualities " of the persons are barely in issue, for just the reason that the disputes between the adults are either irrelevant, or only of secondary significance — and the last only because the child may be affected by the disputes.

The father then a married man living with his wife and child in North Africa, established an extramarital relationship with the mother, a refugee from Central Europe. Both were professional singers in Casablanca. He proposed to obtain a divorce and, according to the mother, eventually marry her. This was in 1952. That same year they both moved to France where for a period they lived together, and the child was born. The facts of their relationship in France, and elsewhere, are much disputed, and charges of misconduct with other persons of the opposite sex are liberally exchanged between them. The child, a boy, is now almost nine years of age.

In April, 1958 the mother and her son settled in this city. In June of that year the father came here and for a short period lived with the mother and child. Later they separated again, but the father continued to visit with the child until January, 1961 when the mother refused him any further visits. In the meantime the father paid the child's tuition at a private school at the rate of $72 per month but contributed nothing beyond that, nor did he contribute any support for the child during the summers. The mother is employed.

The father obtained a divorce from his wife in 1953. Hence, both the father and mother are now free to marry, but each declines to marry the other. He says he no longer supports his former wife or their child because the wife declines to receive such support, and evidently, like the mother in this case, wants no part of him.

On the hearing at Special Term, only a brief portion of which was recorded, the father admitted to earning $65 per week but stated that he was unable to make any contribution for the child's support during the summer because he needs his earnings for his own necessities. Eventually, after being pushed, he expressed a willingness to provide support at the rate of about $30 per month during the summer.

In this State it has been definitively stated with respect to illegitimate children, following the ancient rule, that in the absence of unfitness or inability in the mother she is entitled to the exclusive custody of the child (*People ex rel. Meredith* v. *Meredith,* 272 App. Div. 79, affd. 297 N. Y. 692). In the *Meredith* case the reasons, in law and in morals, for the scope of this principle were elaborately detailed. At the same time recognition was given to the primary principle that it is the

interest of the child which is always to be served and that the courts are not concerned, except secondarily, with the rights, as such, of the father or the mother.

Thus it was said (pp. 82, 83):

" The rule is that the mother has the right to the custody of an illegitimate child as against the father, though the father has the right to the custody as against a stranger. (2 Kent's Comm. [14th ed.], 317; *Matter of Doyle,* 1 Clarke Ch. 154; *People ex rel. Trainer* v. *Cooper,* 8 How. Pr. 288, 293.) The very statement of the rule shows that, under certain circumstances, the father has a right to the custody of his illegitimate child. Where, as in the case at bar, it appears that the mother is not a proper and suitable person the court, in behalf of the child, will interfere with the mother's custody of an illegitimate child and direct that it be placed elsewhere. (*Robalina* v. *Armstrong,* 15 Barb. 247; *People* v. *Landt,* 2 Johns. 375.) The proper statement of the rule is that the mother of an illegitimate child is prima facie entitled to its custody and, when she is a proper and suitable person, the court will award its custody to her as against the father or anyone else. (10 Carmody on New York Pleading and Practice, § 45, and cases cited.)

\* \* \*

" As previously indicated, implicit in the determination of the learned court is a finding that the mother is not a proper and suitable person to have the custody of this three-year-old girl."

There is not much dispute about the principles (16 N. Y. Jur., Domestic Relations, § 476 to the same effect; cf. *Matter of Anonymous,* 12 Misc 2d 211, containing a complete discussion but where the illicit household had existed in stable family unity for a long period and it was the mother who walked out to live with another). As happens so often, the occasion for and mode of application of the principles creates disputes.

In effect, the principles are no different from those which govern the custody of children born in wedlock; but special attention is given to the fact that the continued relationship of the child to parents who were never married involves different considerations than those with respect to children of parents married but separated, or once married but now divorced.

Visitation is, of course, a species of custody and involves, of necessity, correlative control over (and, therefore, interference in) the upbringing of the child (*People ex rel. Meredith* v. *Meredith,* 272 App. Div. 79, 87, *supra*; *People ex rel. Hacker* v. *Strongson,* 141 N. Y. S. 2d 859; *People ex rel. Cox* v. *Cox,*

124 N. Y. S. 2d 511, 515–516). Indeed, if visitation were not a species of custody, the remedy of habeas corpus would cease to be even arguably available.

Recognition of the right of the father to share in the control of an illegitimate child presents problems and opportunities for conflict, all destructive to the child, compared to which the painfully insoluble difficulties between once-married parents of legitimate children appear small, indeed. Moreover, apart from the child, but because of the child, there is the enforced continuance of relationship between the unwilling mother and the father, stemming from a situation socially condemned and likely to be intolerable to explain or sustain. This is particularly significant if one is to allow the mother, and tangentially her child, to struggle toward an accepted place in the community. It is one thing to entertain and explain the presence of a former husband and father of one's child; it is quite another to entertain and explain the presence of the father of one's illegitimate child. In further addition, the granting of a right of visitation to the father necessarily infringes on the mother's freedom, even as to where she might live, or else one makes it too easy for her to flaunt the court order (*Goldner* v. *Goldner,* 284 App. Div. 961, affd. 309 N. Y. 675; *People ex rel. Meredith* v. *Meredith,* 272 App. Div. 79, 87, *supra*).

For obvious reasons there are not many cases in which the problem presented has been discussed in any depth. However, a distinguished and sagacious Judge in the high Court of Appeal in England, Lord Evershed, Master of the Rolls, had this to say in an unanimous court, in sustaining the exercise of discretion by the lower court in denying rights of visitation to the father of an illegitimate little girl:

"I do not think it necessary in this case to attempt to express general propositions about the duty of a court in cases of this kind, except to assert once more the rule which has long governed the jurisdiction of the courts exercising the equitable jurisdiction which it has in regard to infants, i.e., that the court will consider as the paramount concern the interests of the child. That being so, it is clear that cases might well arise in which the court would regard it as being in the best interests of the child that she should have some relationship with her father although the father is not the lawful father, as that phrase is understood by our law. At the same time, however, it is not to be forgotten that the position of the so-called putative father under our law is widely different from the position of the father of a child born in lawful wedlock, as was pointed out but this court in *Re M. (an infant)* (1) ([1955] 2 All E. R.

911); and it may be stated broadly (and accurately too, I think) that in the case of an illegitimate child the limit of the obligation of the father will be to make financial provision for the child in order to relieve other people, and particularly the general public, of such obligation. The father has no such obligation to bring up the child as has a lawful father.[*] The only parent in that respect which the law regards as responsible for the child is the mother. That being so, I think that the view which the courts generally take in regard to the interests of a child of lawful wedlock, viz., that it is in the child's interests to know both parents, is not at any rate by any means necessarily applicable in the case of an illegitimate child. For I think that that general view proceeds on the premise that the parents mentioned are the child's lawful parents.

" * * * that here the interests of the child required the exclusive care of her mother and a clean break of the connection with the child's father; and that in order to achieve that it must follow, as the night the day, that the mother herself ought to cease to have any connection of any kind with the father * * *.

" It is naturally a sad matter for the father. I do not doubt that he has a true affection for this child. But it is, I am afraid, the consequence of the relationship, and the nature of the relationship, that he had with the mother, and of the view which the courts take in such cases of illegitimate children ". (*Re G.* [*an infant*] [1956] 2 All E. R. 876, 879–880.) (Asterisk and footnote supplied.)

While there were other variant circumstances of emotional conflict in Lord EVERSHED's case, the applicable and almost universal principle with respect to illegitimate children, as expressed in the *Meredith* case (272 App. Div. 79, *supra*) appears, together with eloquent statement and sympathetic understanding of the life problem involved.

Of course there should be no rigid rule that would prohibit in every conceivable case the visitation of an illegitimate child by its father; but it is the rare case indeed, in the absence of unfitness or inability in the mother, and over her objection, that a court should require visitation. The fact is, this case offers no support for an exception.

The father in this case caused the child to be conceived while he was married and living with his wife and her child. He no longer supports them.

---

* A highly significant distinction. The rule is similar in New York. The father does not have the same responsibility as a lawful father (*Schaschlo* v. *Taishoff*, 2 N Y 2d 408).

His relationship with the mother was intermittent, and tawdry, and his present interest in the child is a qualified selfish interest. The mother has made it clear that she wants no part of him and there has been no showing that the child needs him. The unfortunate woman and the child should be left in peace.

Here, in contrast to the *Meredith* case, there is no suggestion of the mother's unfitness. More significantly, there is no suggestion that the father's attention is required except to satisfy his "parental affection" and that the child enjoys the father's company. Evidently, the father suffers no pain in the total separation from his other, legitimate child, whom he does not support. This is not enough to sustain judicial command, over the mother's objection, to continue a relationship, simulating, if not burlesquing, that of married or once-married parents, but exposed to ostracism and ridicule under existing mores. Worse, the father's visitation may make even more difficult the mother's adjustment or future marriage — all to the detriment of her child. Still the worse is that the passing years will intensify these problems, reach a peak in the child's adolescence, and they will not subside until the child is an adult and has his own home.

Accordingly, I am constrained to dissent and vote to reverse and dismiss the petition.

BOTEIN, P. J., RABIN, VALENTE and McNALLY, JJ., concur in Memorandum by the Court; BREITEL, J., dissents in opinion.

Order, entered on April 17, 1961, to the extent it grants visitation rights to the petitioner, affirmed.