Gwiszcz Appeal.

Argued March 16, 1965; reargued June 15, 1965. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, FLOOD, JACOBS, and HOFFMAN, JJ.

*Joseph A. Hagerty,* for appellant.

*Joseph J. Carlin,* for appellee.

OPINION BY HOFFMAN, J., September 16, 1965:

Frank J. Rozanski, appellee, filed a petition to obtain visitation rights with his illegitimate son, Bruce Gwiszcz. On October 19, 1964, Judge STOUT of the

County Court of Philadelphia permitted such visits. From this order, the mother, Evelyn Gwiszcz, now appeals.

Two questions are set forth for our determination:

(1) May a putative father be awarded the privilege of visiting his illegitimate child who is in the custody of the mother?

(2) Should the putative father be permitted to visit his illegitimate son in the instant case?

## I

Most recently, in *Commonwealth ex rel. Golembewski v. Stanley*, 205 Pa. Superior Ct. 101, 208 A. 2d 49 (1965), we decided, President Judge ERVIN dissenting, that "[A]s a matter of legal policy . . . it is detrimental to the welfare of an illegitimate child in the mother's custody to award visitation privileges to the putative father." Accordingly, that case stands for the proposition that a putative father may *never* be granted the privilege of visiting his illegitimate child when it is in the mother's custody. Since *Golembewski* was a case of first impression in the appellate courts of Pennsylvania, we have been asked to reconsider that decision. After further study, we conclude that our statement of law in *Golembewski* should be overruled. We now hold that it is proper for the courts, in the appropriate circumstances, to grant visitation privileges to a putative father.

At common law, the custody of an illegitimate child was given to the local parish. The rule was first modified by placing the exclusive right to custody in the mother. Subsequently, the right of custody was extended in many jurisdictions, including Pennsylvania,[1] to include

---

[1] See *Moritz v. Garnhart*, 7 Watts 302 (1838); *Pote's Appeal*, 106 Pa. 574 (1884); *Commonwealth ex rel. Human v. Hyman*, 164 Pa. Superior Ct. 64, 63 A. 2d 447 (1949).

the putative father under certain circumstances. The almost universal rule that the best interests of the legitimate child govern the award of custody has been similarly extended in a majority of jurisdictions to include illegitimate children.[2]

Whether the putative father should be permitted to *visit* an illegitimate child in the custody of the mother has not been considered as extensively. Courts which have been confronted with this problem, however, have recognized that such privileges may be granted. See, e.g., *Baker v. Baker*, 81 N. J. Eq. 135, 85 A. 816 (1913); *People ex rel. Mahoff v. Matsoui*, 247 N.Y.S. 112 (1931); *In re Anonymous*, 172 N.Y.S. 2d 186 (1958); *People ex rel. Francois v. Ivanova*, 14 A.D. 2d 317, 221 N.Y.S. 2d 75 (1961); *Strong v. Owens*, 91 Cal. App. 2d 336, 205 P. 2d 48 (1949); *Ex parte Hendrix*, 186 Okla. 712, 100 P. 2d 444 (1940); *In re G.*, 1 W.L.R. 911, 2 All E.R. 876 (C.A. 1956).[3] In each of these cases, the primary concern of the court was not the illegitimacy of the child or the relationship of the parties; the ultimate decision was based on the child's welfare.

We similarly recognize that in any case involving visitation, neither the fact of illegitimacy nor the personal preferences or prejudices of the parents should control our decision. *The governing criterion must always be the welfare and best interests of the child.*

Illegitimacy, however, continues to strike a discordant and jarring note in our society. It is regarded as the fruit of a union of shame, irreverence and depravi-

---

[2] See, e.g., *Latney's Appeal*, 146 Pa. Superior Ct. 20, 21 A. 2d 521 (1941), and, especially, the excellent and exhaustive note on custody and visitation rights of a putative father in 26 Albany L. Rev. 335 (1962).

[3] See also the statement in 10 C.J.S. Bastards, §17, p. 84: "A father has a legal right to reasonable access to his bastard child, where he contributes to its support, and there is no showing that such right would be detrimental to the child's best interests."

ty. We have not yet achieved that sophistication or charity which would allow us to understand and deal with this problem without passion. Indeed, our wrath has most often been visited not upon those who have violated our ethical and moral codes, but, rather, upon the blameless child.

Unfortunately, no subterfuge, artifice or device can ever fully conceal this condition from the community's prying eye. Exposed to this hostile environment, the child may develop symptoms of rejection and inferiority. Every supportive measure must be employed to protect such a child.

Courts in other states have recognized the benefits which may result from permitting a putative father to visit with his illegitimate child. In *People ex rel. Mahoff v. Matsoui,* supra, the court concluded that: " '[T]he father must not be excluded from a full opportunity to have such possession of his child as will enable him to impart to it what from the father enters into the child's character, and to indulge the affection that a father feels and bestows, whereby the boy may grow up in knowledge and love of him.' The same is true concerning the importance of preserving here the affection which manifestly exists between the respondent and the child, even if the respondent is only its putative father."

In *Baker v. Baker,* supra, Vice-Chancellor Howell of the New Jersey Court of Chancery stated:

"I think it is much better for the child to have the father visit it at stated times, not only to learn of its continued welfare, but to infuse into it, at an early age, the natural love and affection that it should have for a parent who is interested in its well-being. In his later years, he will be able more lightly to bear the ignominy of his origin, if he has the consciousness that he is acknowledged to be on the same affectionate footing as the other child, notwithstanding the disparity

between their legal situations."[4]

To state as a matter of law that the visits of a putative father are always detrimental to the illegitimate child's best interests is to exalt rule over reality. This approach ignores the growing recognition in our courts, and in courts throughout the nation, of the need to determine the welfare of each child in light of his own particular needs and circumstances.

The putative father may, in many instances, instill in the child a sense of stability. He may develop qualities in the child which the mother is uninterested, unwilling or incapable of developing. To the extent that he can perform such a valuable service, his presence becomes exceedingly important.[5] Certainly, to the illegitimate child, the father is never putative.

We recognize that granting visitation privileges to the putative father may not always serve the child's best interests. Visitation rights, however, are always a matter for the supervision of the courts. Should it appear, after visitation privileges have been granted, that the father's presence has an adverse effect on the child's welfare, the right to visit may be withdrawn.

In summary, every case must be decided on the basis of its own particular facts. The unique problems of

---

[4] The petition was for visitation with two children, one of whom was illegitimate under New Jersey law.

[5] Vice-Chancellor Howell's statement in *Baker v. Baker*, supra, should also be noted:

"It was stated on the argument that the father in this case was making a monthly contribution to the maintenance of the children. Why has he not a right to see the children and determine for himself whether the stipend is being properly administered? Why has he not an interest to satisfy himself by inspection that the illegitimate child is being properly clothed and nourished, and that it has a proper home to live in, that care is being taken of its training, its education, and its moral bringing up? The statutes of this state, relative to the custody, care and maintenance of children, are supposed to relate solely to children born in lawful wedlock. Why the principles thus legislated upon do not apply with equal force to illegitimates, I am not able to perceive."

each child must receive individual attention and consideration. Any attempt by us to determine the best interests of every child by a single rule would be judicially, socially and morally unsound.

## II

With the above principles in mind, we turn to the facts in the instant case.

Frank J. Rozanski, a married man, and Evelyn Gwiszcz, a single girl, became the parents of a baby boy, Bruce, on June 21, 1961. The putative father paid the hospital bill incurred at the time of birth and secured an apartment for Miss Gwiszcz and Bruce. For approximately one year, until he lost his job, he gave them $40.00 to $50.00 a week. He then offered to pay $15.00 a week even though the judge, at a preliminary hearing, suggested $10.00 a week. Mr. Rozanski entered into a property settlement agreement with his wife and started divorce proceedings in order to marry Miss Gwiszcz. After several visits to a priest, however, Mr. Rozanski and Miss Gwiszcz decided not to marry. Subsequently, Mr. Rozanski was reconciled with his wife.

The putative father testified that his relationship with Bruce was excellent. He stated that he felt a moral obligation to support and educate the child as though he were his legitimate son. Such concern is clearly apparent in Mr. Rozanski's conduct. He visited his son an average of three times a week. During these visits, he bought clothes and toys for the boy, took him to the doctor, and participated in various activities with him.

Miss Gwiszcz admitted that Mr. Rozanski treated Bruce well and that Bruce called him "Daddy." However, differences arose between Miss Gwiszcz and Mr. Rozanski. She testified that they argued frequently

and that Mr. Rozanski had struck her several times. Mr. Rozanski admitted that he had slapped her once or twice when he arrived at her apartment and found the baby alone.

In January of 1964, Mr. Rozanski was denied access to the boy by Miss Gwiszcz. She stated that she had met a young man whom she intended to marry "not immediately, but in the future." Since her possible future husband might wish to adopt the child, she did not want Mr. Rozanski to continue seeing Bruce. Thus, in February of 1964, Mr. Rozanski sought the aid of the courts in order to acquire visitation rights.

Judge STOUT, in the lower court, had the opportunity to observe the putative father and appraise his fitness. She was impressed by his responsibility, industry and devotion to his son.

It is true that the testimony in the lower court reflects that the relationship between Mr. Rozanski and Miss Gwiszcz is strained. While this situation might indicate that meetings between the two in the presence of the child would be undesirable, we should not ignore the possibility that each can contribute individually to the child's welfare. The lower court took notice of this, and specifically ordered that ". . . visitation should not occur in the mother's home or in her presence."

The mother's contention that she may marry sometime in the future and have her new husband adopt the child should not prevent us from awarding visitation privileges at this time. It is true that a husband may extend the guiding hand of a responsible older male which is so often of crucial importance in a boy's development. The future marriage of the mother is purely conjectural, however, while the child's needs are present, immediate and urgent. Now, only the putative father can continue to serve as the significant older male figure upon whom the child may rely for

guidance. It would seem socially and psychically desirable to retain this relationship until such time as the mother has married another man willing to assume familial responsibilities. Since the present order granting visitation privileges is only temporary in nature, our courts, which are sensitive to the child's best interests, may withdraw such privileges in the future if such action is warranted.

We recognize that Mr. Rozanski is not wholly without fault. His shortcomings should be taken into consideration, however, only to the extent that they may prove harmful to the child's welfare. After reviewing the record and balancing the countervailing arguments, we conclude that the father has contributed much to the child's development, and should not be barred from doing so in the future. In our opinion, the interests of the child will best be served at the present time by affirming the order of the lower court allowing visitation privileges.

Order affirmed.

MONTGOMERY, J., being unwilling to overrule *Golembewski,* respectfully dissents.

———

DISSENTING OPINION BY WATKINS, J.:

I respectfully dissent. The question in this case was resolved in *Com. ex rel. Golembewski v. Stanley,* 205 Pa. Superior Ct. 101, 208 A. 2d 49 (1965). I believe that ". . . as a matter of legal policy, that it is detrimental to the welfare of an illegitimate child in the mother's custody to award visitation privileges to the putative father." The grant of such rights emphasizes and advertises to the community in general the illegitimacy of the child to the child's detriment. It can, too, by this sanction of the creation of legal rights in a putative father, encourage the renewal of the meretricious relationship between the parties which cannot possibly contribute to the welfare of the child.

It is significant that our legislature has eliminated the necessity of consent by putative fathers in adoption cases. Act of June 30, 1947, P. L. 1180, 1 P.S. 2.

There should be some certainty to the law so that the bar has definite guidelines. The theory of "stare decisis" has received a modern buffeting in many legal quarters and of course bad law should not remain in force because of errors in the past, but to change the concept of the law every other month makes a mockery of its majesty and a yo-yo of its practice.

WRIGHT, J., joins in this dissent.